Jayne G. NATHANSON, Appellant,

v.

The MEDICAL COLLEGE OF PENNSYLVANIA.

No. 90–1311.

United States Court of Appeals,
Third Circuit.

Argued Nov. 5, 1990.

Decided March 4, 1991.

**1370**

Martha Sperling (argued), Elizabeth O. Tomlinson, Silver & Sperling, Doylestown, Pa., for appellant.

Francis J. Connell, III (argued), Drinker, Biddle & Reath, Philadelphia, Pa., for appellee.

Before SLOVITER, Chief Judge,* and SCIRICA and ALITO, Circuit Judges.

## OPINION OF THE COURT

SCIRICA, Circuit Judge.

Jayne G. Nathanson brought this suit against the Medical College of Pennsylvania (MCP) for alleged violations of § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a) (1988), and for tortious interference with her present and future contracts with other medical schools. The district court granted MCP's motion for summary judgment on all counts. *Nathanson v. Medical College of Pa.*, No. 88–7914, slip op. at 1, 1990 WL 31691 (E.D.Pa. Mar. 19, 1990). We will affirm the summary judgment on the tortious interference with contract claims. However, we will reverse the grant of summary judgment on § 504 of the Rehabilitation Act because the district court's decision was based on an error of law and because we find outstanding two material issues of fact: 1) whether MCP had reason to know that Nathanson's condition was a handicap, and 2) whether MCP provided reasonable accommodations for Nathanson's handicap.

## I. FACTS AND BACKGROUND

With noted exceptions, the following facts are undisputed. In 1981, Nathanson was involved in an automobile accident that resulted in continuing back and neck injuries. During the next several years she engaged in physical therapy to recover from her injuries. In 1982, she decided that she wanted to go to medical school and began taking medical-related courses at Temple University and the University of Pennsylvania. In November, 1984, she applied for admission to MCP's 1985 entering class for the M.D. degree. On August 26, 1985, she was accepted for admission to MCP.

During her interviews with two MCP faculty members in July, 1985, and in the narrative section of her application, Nathanson informed MCP about her accident and injuries. She also told the MCP interviewers that she had not been able to sit in the seats provided for examinees for the Medical College Admissions Test (MCAT) because of her disability. Instead, she had been allowed to take the examination at an ordinary table. She stated, however, that

---

* The Honorable Dolores K. Sloviter became Chief Judge of the Third Judicial Circuit on February 1, 1991.

she believed at that time that she would not require special accommodations at MCP because she had "never had a problem" with her seating arrangements during her prior course work at Temple and Penn. App. 132–36.

At issue in this case is what took place between Nathanson and MCP administrators from the time that Nathanson first attended MCP to the point of her final departure approximately one year later. Nathanson's transactions with MCP are important because they clarify when and whether MCP was ever aware that Nathanson had a handicap and had requested accommodations, and whether her requests were sufficiently specific for MCP to respond.

A. *September 10, 12, 1985: Nathanson's Meetings with Appel and Beasley*

Nathanson enrolled in MCP, completed a one-day orientation on Tuesday, September 3, 1985, and began classes on September 4, which she attended until Monday, September 9, 1985. According to Nathanson, her problems at MCP started "from the first day of class" when she encountered difficulty with the school's parking arrangements. She stated that although she spoke to someone about her parking problems, she could not remember the person's name or the title. However, she did remember that "he tried to be helpful and he referred me to, he referred me on to somebody Freeman after that, but I had left [MCP] before I got to speak to Mr. Freeman." App. 143–45.

On September 10, Nathanson met with Dr. Marilyn Appel, MCP's Assistant Dean for Medical Education, to inform her that she was concerned about her ability to continue to attend classes because she was unexpectedly having "severe" muscle spasms in her back and shoulders due to MCP's classroom seats.

A I remember going up to [Appel's] office, telling her the difficulty I was encountering, that it was unexpected, that I felt that the muscle spasms in my back and shoulders were very severe and

I was very concerned about being able to continue.

. . . . .

Q What else do you recall?
A I was crying and she put her arms around me.
Q Do you recall anything else?
A. Yes. She told me to think about this and I told her I couldn't continue to sit in class in that circumstance any longer. She said, okay, but just think about this a day or so and then go to see Dr. Beasley.

. . . . .

Q In your meeting with Dr. Appel, did you ask Dr. Appel to have MCP obtain a desk or a chair that you could tolerate?
A Not in my meeting with Dr. Appel. I told her I didn't know what to do. I know I needed some help. I didn't ask her for anything in particular.

App. 145–48 (Deposition of Jayne G. Nathanson).

According to Nathanson, Appel made no further suggestions or comments. App. 147. On or about September 12, Nathanson followed Appel's suggestion and met with Dr. Andrew Beasley, MCP's Associate Dean for Student Affairs. Nathanson's depiction of the specificity of her request for seating at this time varies at different points in her deposition depending upon whether she is only describing her meeting on September 12, 1985, or whether she is comparing that meeting with her last meeting with Beasley on September 3, 1986. When she is comparing her first and last meetings with Beasley, she states that her request was very specific.

Q What happened in that meeting? [on September 12, 1985]
A Well, I described to him the difficulty I was encountering with the seating, and as a result the physical problems I was having with my neck and shoulders as a result of that, that I was surprised, I was disappointed. I asked him if there was anything that could be done to help. He listened to me and he didn't respond. He just, looked at me sympathetically when I talked to him about the pain I was in

and the medication I was taking. He did not offer to do anything in terms of the seating in response to my request for help. At the end of the conversation I told him that I would very much like to defer beginning these classes until the next year, until the next September, the next academic year. I remember him looking at me and shaking his head.

. . . . .

Q To indicate?
A As if he understood what I was requesting.

. . . . .

A I recall him saying something about a concern about filling a spot, but that shouldn't be my problem. I thought that was strange and I said, no, I understood because I knew how long I waited all summer long to hear, that the sooner the school knows, if they have a vacancy and someone else can fill it, that I was very sympathetic with that....

. . . . .

Q In that meeting did you discuss with Dr. Beasley in any way the seating arrangements that you had encountered at the University of Pennsylvania or at Temple?
A I remember telling him I was surprised that I was having difficulty with the seating arrangements at MCP because I hadn't had difficulty elsewhere.
Q And did you describe for him in that meeting in any way the difference between the seating arrangements at these other schools and at MCP?
A I remember we talked about it, but I don't remember the words I used.
Q Did you ask Dr. Beasley if it would be possible for MCP to get for you the kind of seating arrangement you had had at Temple or at Penn?
A I didn't use the words that you're using. I asked him for his help with the seating, as I said to you, so that I could be able to continue to sit for class.
App. 149–52.
Q Why didn't you simply ask Dr. Beasley to get you a chair like the chairs at Penn when you met with him during the week of ... September 9, 1985?
A That was the gist of what our conversation was as I related it to you.
Q But why didn't you say to Dr. Beasley, look, can't you just get me a chair like the one I had at Penn? You didn't say that, did you?
A No. I asked him to help me with the seating the best he could.
App. 158.
Q Well, what did you have in mind, if anything, that MCP could have helped you put together that you could use?
A What I had described to Beasley before way back in [September] '85, and again when I spoke to him on the 3rd [September 3, 1986], that I just needed, and I described it to you, I needed a chair that was supportive with a continuous back with a high enough writing arm or some type of writing ability to write on a surface that was high, compared to where I was sitting, so that I would not have to lean all the way over.
Q Well, as of September 3rd, 1986, were you aware of the existence anywhere of any such arrangement that would have been available to MCP as of that date?
A I'm not referring to a specifically designed unique object; it could be any chair table height that had a supportive back, that the writing surface was high compared to where I was sitting and I'm sure something could have been put together....
Q Are you telling me that all you needed was a chair with a straight supported back and a table that was of sufficient height so that you would not have to lean over to write; is that what you're saying?
A Yes. It was really very simple.
Q Did you ever make that clear to Dr. Beasley?
A Yes. And the first time I made it clear was when I spoke to him in September of '85. And I demonstrated, my normal way is to demonstrate physically, as well as saying it verbally.

App. 192–93 (Deposition of Jayne G. Nathanson).

According to Nathanson, because Beasley did not respond to her request for help, she informed him that she would like to defer beginning classes until the next year. Beasley asked that she put her request in writing. Apart from one brief contact, Nathanson had no further conversations with anyone at MCP until May 27, 1986.

Beasley depicted his September 12, 1985 meeting with Nathanson somewhat differently. He claimed that throughout their conversation, Nathanson requested only a one year deferral, and nothing more, from MCP. Moreover, "[a]t no time then or at any time since has Ms. Nathanson asked me for any specific accommodative devices." App. 210. He did state, however, that Nathanson explained to him that her physical difficulties would preclude her from attending classes at MCP in the next academic year. App. 209.

Specifically, Ms. Nathanson referred to muscle spasms in her neck and back and

reluctantly concluded that, due to her pain, she would be unable to continue with class.... In this regard, she stated that during the one year period she hoped to sufficiently recover in strength and endurance to successfully attend classes. She also indicated that during that time she would consider modifications of her physical surroundings to reduce the strain on her neck and back. App. 209–10 (Affidavit of Andrew B. Beasley).

B. *September 13, 1985 to April 1, 1986*

In response to Beasley's request, Nathanson wrote a letter dated September 13, 1985, addressed to Beasley, in which she requested permission to defer beginning classes at MCP for one year.[1] Beasley responded in a letter that same day and "granted her request for a year long leave of absence."[2] The differences in terminology used in these two letters became a primary issue in Nathanson's later arguments that she never matriculated at MCP.[3] According to Nathanson, if MCP

---

**1.** Nathanson's letter reads, in part:

I would like to request permission to defer beginning Freshman classes at the Medical College of Pennsylvania for one year. My reason for asking is the increased pain and spasm I have been experiencing in my neck and shoulders, since trying to attend and take notes in class for 6–7 hours per day.

I had been in a car accident several years ago, injuring my neck, back, and shoulders and have made major strides in terms of recovery each year. Based upon my performance under a full-time load last spring, I truly believed that I was physically prepared to handle the burden of a medical curriculum. Sadly this has not been so, each day the situation has worsened in terms of my pain and fatigue and I do not believe my physical condition is good enough to proceed successfully.

I do have reason to hope (based on each year's progress) that by this time next year I will recover sufficiently in strength and endurance. In addition, before starting next fall I would have the opportunity to consider modifications of my surroundings in order to reduce the strain on my neck during classes. I would, as you suggested, either formally or informally continue course work during the year to keep my knowledge current and my study skills sharp.

App. 217. Letter from Jayne G. Nathanson to Dr. Andrew Beasley (Sept. 13, 1985).

**2.** Beasley's letter reads, in part:

This is an official response to your letter of today in which you have requested a leave of absence from your studies for the 1985–86 academic year.

Your request is granted with conditions as follows:

1) You are expected to resume your studies with the first year class of medical students in September 1986.

2) Keep us informed of your situation and let us know in writing by June 1, 1986 of your intent to matriculate for the 1986–87 academic session.

Any extension of the one-year leave-of-absence must be evaluated by the Promotions Committee.

App. 218. Letter from Andrew B. Beasley to Jayne Nathanson (Sept. 13, 1985).

**3.** Nathanson's letter requested that her attendance be deferred for one year. Beasley's letter in response referred to Nathanson's request as a "leave of absence from your studies for the 1985–86 academic year." When Nathanson received Beasley's letter, she called him and asked him why he referred to a "leave of absence." He explained that a deferral and a leave of absence essentially accomplished the same thing, but that the latter would allow Nathanson to resume classes the next year. App. 155–57. When Nathanson was later asked in her deposition about why she was concerned that the term of reference be a deferral rather than a leave of absence, she explained, "I don't know that I was

had granted her a deferral, it apparently would not have considered her as being a matriculated student.

Nathanson's letter explained that she was withdrawing because of physical problems and that "she would try to consider modifications of her surroundings in order to reduce the strain on her neck during classes." App. 217. Beasley's letter in response requested that Nathanson inform the school by June 1, 1986 of her intention to return to MCP in September, 1986. App. 218. During the ensuing year, Nathanson "enrolled in and successfully completed medicine-related courses at Penn in order to maintain [her] study habits." App. 107.

In October, 1985, without informing MCP, Nathanson applied to six medical schools for the 1986–87 academic year using the American Medical College Application Service (AMCAS).[4] Nathanson did not indicate on the AMCAS form that she had attended, or matriculated at, MCP. For example, the 1986–87 AMCAS application requests that applicants list "all colleges, graduate and professional schools attended" and to "include previous medical school[s]." Nathanson did not list MCP. App. 220 (Question 8). The application also asks, "Have you ever matriculated in or attended any medical school as a candidate for the M.D. degree?" Nathanson checked "no." App. 224 (Question 16). Nathanson stated that she made these applications because of MCP's "unresponsiveness to [her] physical needs." Moreover, she decided that her "ability to attend medical school would be better encouraged at a different institution" because she had not experienced any physical problems while she was taking courses at Penn. App. 107.

In February or March, 1986, Nathanson met with Ms. Karen Pfordresher, Director, Student Services and Admissions at Georgetown University School of Medicine. According to Pfordresher's letter of December 5, 1988, addressed to Milton Corn, Dean of Georgetown's Medical School, Nathanson visited Pfordresher

> at least once in February or March of 86 and described her needs relating to her injury. She did say that the facilities at MCP were not acceptable, but did not say that she was on leave of absence or was awarded a deferred accept from that institution. During her interview she stated that she would come to Georgetown unless she were accepted at a Philadelphia medical school. (Date March 12, 1986. Ms. Nathanson according to her admission believed herself to be accepted at a Philadelphia medical school on March 12, 1986—a deferred accept—and therefore may have mislead the interviewer.)

App. 206. Letter from Karen Pfordresher to Milton Corn, M.D. (Dec. 5, 1988).

On April 1, 1986, Nathanson was accepted at Georgetown for the 1986–87 academic year. In mid-to-late April, she visited Georgetown to pay the deposit and to tour the facilities, which, she concluded at that time, were suitable for her back problem. App. 176.

C. *May 27, 1986: Nathanson's Conversation and Correspondence with Beasley*

Nathanson stated that because issues concerning her request for financial aid at Georgetown had not yet been resolved, she delayed her decision to matriculate there in the fall.[5] Therefore, during the spring of

---

particularly concerned, it's just not what I requested in the letter." App. 157. She also stated that when she received Beasley's letter she had no intention of applying to other medical schools. App. 157.

**4.** AMCAS, a centralized application service operated by the Association of Medical Colleges, coordinates the annual application process for most American medical schools. AMCAS also maintains the policies that govern the conduct of applicants and medical schools in addition to

any irregularities in the application process. App. 273–79.

**5.** In order to determine Nathanson's financial aid status, Georgetown requested that she provide documentation of her parents' finances. Nathanson stated that she thought that such documentation was unnecessary because she was married and nearly 40. App. 110. As of August 4, when Georgetown's committee met to review Nathanson's case, Nathanson's financial aid package was, to their knowledge, still in-

1986 she continued to stay in contact with MCP about the suitability of her physical accommodations should she return to MCP in the fall.

On or about May 27, 1986, Nathanson telephoned Beasley requesting an extension of the June 1, 1986 deadline to give MCP notice of her intent to resume her course work in the fall. She did not tell Beasley that she had been accepted by Georgetown. She did tell him that she thought that MCP's facilities were inadequate for her physical condition and that she would investigate whether she could find "some type of chair similar to the one [she] sat in at the University of Pennsylvania." According to Nathanson, Beasley made no offer to help her with finding seating arrangements. App. 168. See also Letter from Jayne G. Nathanson to Dr. Andrew Beasley (June 23, 1986) (referring to their conversation on May 27, 1986). Beasley confirmed that Nathanson made this request, and stated that Nathanson told him that she was "exploring possible companies that could provide her with a chair that would satisfy her needs." App. 79. Beasley denied Nathanson's request for an extension but encouraged her to send a letter to hold her place because she could change her mind later on. App. 168–69.

In a letter of May 27, 1986, Nathanson notified Beasley that she would attend MCP in September, 1986. She also indicated that she was concerned about, and was investigating alternatives for, her "physical arrangements" and that she wished to speak with him further about the situation.[6] Beasley did not respond to this letter, explaining that it was his understanding that Nathanson would contact him. App. 85–87.

Nathanson stated that she indicated to Beasley in her letter that she was assuming "the burden of the initial search and investigation [of the chair] simply because they [MCP] were not taking it on and I at that point felt that there was no other choice." App. 170. However, because of this, she also stated that she thought it was reasonable for Beasley to assume that she was "investigating the special chair and that [she] would come in and look at the facilities there and would be in touch with him." App. 171. Moreover, she thought that it was reasonable for Beasley to assume that she did not expect MCP to do anything about a chair until MCP had heard further from her. App. 171.

D. *June, 1986: Nathanson's Visit to MCP and Conversation with Beasley*

In June, 1986, Nathanson and her husband visited MCP to examine the facilities. According to Nathanson, she asked for Beasley's "help and cooperation" in installing a special chair in the lecture hall but she could not recall Beasley's response. App. 172–73. Nathanson stated that she also saw Appel in the cafeteria afterwards and explained that she was trying to sit in the seats again and determine "how something could fit in." Appel responded that "she didn't think the chairs were very comfortable to a person with my type of back. She understood why I was having a problem." App. 172–73.

With regard to the June, 1986 encounter, Beasley stated that Nathanson had not made an appointment with him but simply approached him while he was in the hall during a break between a class that he was teaching. He stated that Nathanson asked to see where her classes would be held in September and he directed her to the ap-

complete. App. 236–37. Classes began at Georgetown on August 14. App. 252.

**6.** Nathanson's letter of May 27, 1986 included the following:

In order to attend classes it will be necessary for me to procure a special chair for lectures and conference. I am in the process of investigating, whether lecture hall chairs that I have previously used elsewhere could be mod-

ified for use at MCP. I am especially concerned about the physical arrangements for conference and laboratory. In order to have a better idea of what type of installation would be appropriate, I would like to speak with you further.

App. 226. Letter from Jayne G. Nathanson to Dr. Andrew Beasley (May 27, 1986).

propriate classrooms. "During our brief conversation, Ms. Nathanson did not discuss any particular seating arrangement with me and she did not ask for MCP's help in devising one." App. 211.

E. *July 17, 1986 to August 20, 1986*

On July 17, 1986, Beasley learned of Nathanson's acceptance by Georgetown through his secretary, who had been reviewing an AMCAS computer printout (the National Multiple Acceptance Listing). Upon further inquiry, he also learned that Nathanson had not indicated on her application that she had matriculated at MCP. App. 88.

In a letter of that same date, Beasley wrote to Nathanson requesting that he be informed of the "circumstances of her action."[7] App. 227. Also on that same day, Beasley informed Pfordresher about the situation by letter and a phone call. According to Beasley, he then sent, to Pfordresher and to Richard Randlett, Director of the Association of American Medical Colleges, copies of four letters: Nathanson's letters of September 13, 1985 (requesting that she defer classes for one year) and May 27, 1986 (notifying Beasley of her intent to begin classes at MCP in September) and Beasley's letters of September 13, 1985 (granting Nathanson a leave of absence) and July 17, 1986 (requesting that she explain the "circumstances of her action"). App. 92–93, 212. Beasley also sent a copy of his July 17, 1986 letter to Nathanson to Dr. Mary Ellen Hartman, another MCP administrator. App. 227.

Beasley explained that he contacted Georgetown before he contacted Nathanson because it was a "unique circumstance" to have a student on leave of absence who was holding a place at another medical school for the fall. App. 90, 94. Moreover, it was "quite routine" after June 1 in any admissions cycle to telephone among medical schools if a student was holding an acceptance at more than one medical school. App. 94.

Nathanson explained her ensuing behavior:

> From that time [July 17, 1986] until the Promotions Committee [at MCP] acted formally to terminate my opportunity of studying at MCP, I was informed by MCP officials that my opportunity to study at MCP would be in grave doubt. I remained steady to order special seating if necessitated by (a) a refusal by Georgetown to honor its acceptance or to extend adequate financial aid, (b) MCP's ultimately allowing me to study at that institution in the fall, and (c) a continued refusal by MCP to take any steps itself to accommodate my injury. But given the threats and pessimistic indications given me by MCP, I did not order any special chairs; to do so would have cost me well over a thousand dollars that I could not afford to invest in lecture hall seats that I would likely never be able to use.

App. 111–12 (Affidavit of Jayne G. Nathanson).

In letters of July 23 and 24, 1986, Nathanson informed Beasley, Randlett, and Pfordresher that she was unaware that she had matriculated at MCP and described the situation as a "misunderstanding." App. 285–86; 289–90. She contended specifically in her letter of July 23 to Beasley that

---

7. Beasley's letter reads, in part:

 I am writing this letter to indicate my concern about the fact that you are holding a place in the first year medical school class at the Georgetown University School of Medicine for the class of 1986.

 Our records indicate that you matriculated at our school on September 3, 1985 as a first year medical student, that you requested and were granted a leave-of-absence on September 13, 1985 and that on May 27, 1986 you wrote to me to indicate that you would resume your studies with us in September 1986.

 Today, we contacted AMCAS and were informed that you had resubmitted an application on Oct. 15, 1985 for classes to start in September 1986 and you indicated on that application that you had not previously attended medical school.

 It would be appreciated if you let me know more about the circumstances of your action. App. 227. Letter from Andrew B. Beasley to Jayne G. Nathanson (July 17, 1986).

she did not think that she had matriculated because she had never paid MCP tuition or fees, had taken no exams, and had only attended classes for four days. Moreover, she wrote that in her conversation with Beasley on May 27, she had indicated that she might be better suited at another school where the physical accommodations were more compatible with her needs because she had had no physical problems that year when she took courses at the University of Pennsylvania and was progressing well academically.[8] Nathanson made similar contentions in her letter of June 23 to Randlett and in her letter of June 24 to Pfordresher.

In a letter of August 4, 1986, Georgetown formally withdrew its offer of admission to Nathanson stating that it was Georgetown's policy, "in accordance with guidelines established by the AMCAS, that acceptances are not to be offered to matriculated students." App. 251. In a letter of August 12, 1986, and in a telephone conversation the next day, Beasley informed Georgetown that MCP had no objection if Georgetown accepted Nathanson for its 1986–87 entering class. App. 253. Georgetown nevertheless chose not to accept Nathanson.

On August 11, 1986, MCP convened its Student Promotions Committee to review Nathanson's case. On August 19, after reviewing the AMCAS Application and Designation Form, and Nathanson's responses, the Promotions Committee voted to dismiss Nathanson from MCP. According to MCP, the vote was a result of Nathanson's "misrepresentations and her failure to disclose to MCP that she had been accepted by and had submitted a deposit to Georgetown while encouraging MCP to hold her seat for the 1986 entering class." App. 292. On August 20, Nathanson was advised of the Promotions Committee's vote and of her right to appeal the decision.

### F. *August 21, 1986: Nathanson's Meeting with Beasley and Hartman*

On Thursday, August 21, 1986, Nathanson met with Beasley and Hartman for an explanation of the Promotions Committee's appeal procedure. At this meeting, Nathanson stated that she required special parking privileges and seating accommodations in order to study at MCP. App. 181–82. In response, Beasley said that MCP "would do the best it could do to help her." App. 213. However, Hartman became "extremely angry.... She gritted her teeth, her face became red and just at my sugges-

8. Nathanson's letter reads, in part:

With reference to our phone conversation about your letter of July 17, I wanted to let you and the committee know that I did not understand that I was actually considered to be a matriculated student at M.C.P., and I therefore did not knowingly misinform A.M.C.A.S. or any other medical school about my status. I was at M.C.P. only 4 days before expressing my concern that the physical situation (lecture and conference hall seating) was severely aggravating an injury I had received in a car accident. I then stopped going to class, spoke with you and Dr. Appel, and requested a deferral of my acceptance so that I could try to modify the physical situation and reconsider my alternatives. You gave me a leave which contained no restrictions as to what I could or could not do during the year....

As you suggested in September, I resumed my studies immediately at the University of Pennsylvania, taking medical school and arts and sciences courses (three in the Fall) and found, as before, that I had no difficulty there with the seating, etc. When we spoke on May 27th, I expressed some concern that I might

be more successful at another school where the physical appurtenances and my particular physical situation would be more compatible, but I hoped to attend M.C.P. and try and see if I could modify the seating arrangements (which I am continuing to pursue).

. . . . .

With regard to my reapplying: late in September, after seeing how well physically and academically I was progressing at Penn, and thinking about my alternatives, I decided to apply again. I was not under the impression, nor was it indicated in your letter to me, that I was not permitted to do this. I sincerely did not believe that being at M.C.P. for 4 days, having taken no exams, having paid no tuition, constituted formal attendance or matriculation at a Medical School.... I wish I had been given the opportunity to explain before you wrote the letter to A.M.C.A.S., etc. I would have informed Georgetown and the other schools of the misunderstanding myself. I had no wish to deceive or misinform anyone, least of all yourself.

App. 285–86. Letter from Jayne G. Nathanson to Dr. Andrew Beasley (June 23, 1986).

tion that I would require something like [that]." App. 180. According to Beasley, "[t]his was the first time [Nathanson] had indicated in any way that she wanted MCP to do anything for her [by way of] seating arrangements." App. 213.

Beasley stated that although he was aware that Nathanson had a problem before this time, he did not consider taking any action to assist her in dealing with it "[b]ecause it related to medical issues and Mrs. Nathanson stated on multiple occasions that she was pursuing a course of action to deal with these issues, and I would not interfere with what she was doing." App. 71. He also stated that he would decline to assist a student in "[a]ny personal issue that I would feel that it might be an invasion of their privacy, any issue relating to their emotional or mental status or physical status where I would not be qualified to deal with the issue." App. 72. He considered Nathanson's difficulty with seating at MCP to be a personal problem that might involve an invasion of privacy. App. 72.

In addition, Beasley contended that because he felt unqualified to deal with the medical issues that students presented to him, he responded only to requests for assistance "and this request had not been made of me." App. 70. Moreover, he required that a physician must document a student's medical need in order for him to take any action. App. 73. However, Beasley's requirement for medical documentation was not a policy of MCP's and he did not know if it was a policy that others at MCP shared. App. 73–74. He also stated that he thought that Nathanson had a medical problem. App. 74.

On September 2, 1986, at Nathanson's request, the Promotions Committee reconsidered its decision at an appeal hearing and reinstated her.[9] On that same day, Beasley called Nathanson at home and left

her a message that the Committee had reinstated her. App. 214.

### G. September 3, 1986: Nathanson's Meeting with Beasley

On September 3, Beasley called Nathanson again to inform her that she had been reinstated and that she was to register and begin classes that same day. During their conversation Nathanson told him that she was once again concerned about the facilities, and that now that she knew that MCP's decision was definite, she would have to call the chair company to see how quickly a chair could be ordered. She asked Beasley if there were some way that she could delay registering for 24 hours to assess the chair situation because she did not want to register at MCP unless she was certain that she could attend. She wanted to avoid going before the Promotions Committee once again. Beasley denied Nathanson's request for a 24–hour extension and indicated that if Nathanson did not register by the end of the day, she would have to go before the Promotions Committee again. App. 184–85.

Allegedly in light of Beasley's denial, Nathanson did register at MCP on September 3. Later that day, Nathanson visited Beasley about her concerns with seating arrangements. He suggested that she examine the facilities to determine if anything were available to suit her. App. 190.

A [At the meeting with Beasley] I asked him specifically with his help could he help me get some chairs and tables, whatever, so that I could sit and write in the lecture hall, that I would need some again in the conference room. I told him that … I had tried to get in touch with the [chair] company, I was waiting for a call back from the company to see if there was a sample or whatever immediately available, that I wasn't going to be able to attend class until I had the proper chairs. I remember saying to him that I

9. MCP originally scheduled the appeal hearing for Monday, August 25, 1986. However, Nathanson's attorney requested a postponement of "several days" because Nathanson had just hired her and she needed some time to review the case. MCP then scheduled the meeting for Tuesday, September 2. These dates become important on the issue of tortious interference because Nathanson argued that MCP delayed the appeal procedure until the day before registration.

didn't want the same thing to happen as last year, and he looked at me and his response to me was, well, you can go look over the conference room, and he pointed over there, in the direction of the conference room he was sending me. He said you can look around and see what you could find. I took his suggestion.

. . . . .

A I went back to Dr. Beasley and I told him that I went to the lecture [hall] and I looked in the conference room and that I couldn't use any of those chairs, that the lecture chair was far superior than anything in the conference room because they were the same type of chair that I described to you that you characterized as a student desk. Some of them were taller, or shorter, all metal, without padding, with a continuous back, that I couldn't have sat in or written in with a low arm, and I recall saying to him that I hadn't found anything.

Q And how did he respond?

A Just shrugged his shoulders, like this (indicating).

Q What happened next in that meeting?

A I left.

. . . . .

Q As far as you knew at that time, were there any satisfactory alternatives other than obtaining a chair from that company?

A Not unless, you know, MCP was going to help me out to put together something that I could use.

App. 188–91 (Deposition of Jayne G. Nathanson).

Nathanson then specifically indicated to Beasley that it would take about a month

for her to get a chair made by special order unless the company could also provide her with a sample of some sort while she was waiting.

### H. *September 5, 1986 to October, 1988*

In a letter of September 5, 1986, Nathanson informed MCP that she would not be able to attend classes there because it would be impossible to accommodate her seating requirements within a reasonable period of time.[10] App. 255. Nathanson did not attend classes at MCP in 1986.

Nathanson applied to other medical schools for the 1987–88 and 1989–90 academic years. Because MCP had informed AMCAS that Nathanson had matriculated there, she was required by AMCAS to indicate her matriculation status on her subsequent applications to medical schools. As a result, five medical schools to which Nathanson applied in 1987 required that she acquire a statement from MCP confirming that she had matriculated there and had left in good standing. MCP provided this statement. Nathanson was not accepted for admission by any medical school for the entering classes of 1987 and 1989.

In October, 1988, Nathanson filed her complaint alleging that MCP violated § 504 of the Rehabilitation Act by failing to "reasonably accommodate" her handicap in 1985 and 1986 (counts I and II). She further alleged that MCP interfered with her acceptance at Georgetown by advising Georgetown of her previous matriculation and attendance at MCP (count III). She also claimed that MCP tortiously interfered with her contractual relationship with Georgetown in 1986 (count IV) and with her prospective relationship with other

---

**10.** Nathanson's letter reads, in part:

I am writing to inform you that I will not be able to attend M.C.P. The events of the last months have precluded my being able to modify the facilities necessary for me to attend classes within any reasonable period of time.

I feel that my particular physical situation and the physical arrangements at M.C.P. are truly incompatible, and by attending I would be making what is normally a very rigorous first two years even more strenuous than would be reasonable.

This decision does not reflect on my sincere desire to become a physician, but only reflects my belief that I would ultimately be more successful in my studies at another institution.

It is with great reluctance and disappointment that I must withdraw. Further correspondence will follow.

App. 255. Letter from Jayne G. Nathanson to Dr. Andrew Beasley (Sept. 5, 1986).

medical schools in subsequent years (count V). Nathanson sought over $1,000,000 in damages and declaratory and permanent injunctive relief. As we have noted, the district court granted summary judgment in favor of MCP on all counts.

## II. STANDARD FOR SUMMARY JUDGMENT

Our standard of review of the district court's entry of summary judgment is plenary. *Turner v. Schering–Plough Corp.*, 901 F.2d 335, 340 (3d Cir.1990). Summary judgment may be granted only if there exists "no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Bushman v. Halm*, 798 F.2d 651, 656 (3d Cir.1986). Summary judgment may not be granted, however, if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed. *See, e.g., Gans v. Mundy*, 762 F.2d 338, 340 (3d Cir.), *cert. denied*, 474 U.S. 1010, 106 S.Ct. 537, 88 L.Ed.2d 467 (1985).

For purposes of its motion for summary judgment, MCP admitted Nathanson's version of the objective facts, including her allegation that she was handicapped under § 504 of the Act. Moreover, for purposes of deciding this case, the district court assumed that Nathanson was handicapped and that this case could therefore be resolved as a matter of law. *Nathanson*, slip op. at 2. Therefore, whether or not Nathanson was handicapped is not before us.

## III. SECTION 504 OF THE REHABILITATION ACT

 Section 504 of the Act provides, in part, that:

No otherwise qualified individual with handicaps in the United States, as defined in section 706(8) of this title, shall, solely by reason of her or his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

29 U.S.C. § 794(a) (1988). In order to establish a violation of the Rehabilitation Act, a plaintiff must meet four requirements: 1) she is a "handicapped individual," 2) she is "otherwise qualified" for participation in the program, 3) the program receives "federal financial assistance," and 4) she was "denied the benefits of" or "subject to discrimination" under the program. *Strathie v. Department of Transp.*, 716 F.2d 227, 230 (3d Cir.1983).

As we have noted, MCP admitted for the purposes of summary judgment that Nathanson was a "handicapped individual" and that it receives federal financial assistance. Moreover, it is apparent that Nathanson was "otherwise qualified" to participate in MCP's program because MCP permitted Nathanson to matriculate twice without indicating at any time that Nathanson's physical problems would interfere with her ability to be a qualified medical student or physician. *See Southeastern Community College v. Davis*, 442 U.S. 397, 406, 99 S.Ct. 2361, 2367, 60 L.Ed.2d 980 (1979) (defining an individual who is "otherwise qualified" as "one who is able to meet all of a program's requirements in spite of his handicap").

At issue here, then, is the district court's conclusion about the fourth requirement relating to discrimination and denial of the program's benefits. As the district court said, "[a]lthough [Nathanson] discussed her physical discomfort in prior correspondence with defendant, no reason existed for defendant to consider plaintiff's condition to be a handicap as contemplated by the statute ... [or] that plaintiff did not have meaningful access to defendant's program." *Nathanson*, slip op. at 3.

For the reasons provided below, we cannot agree with this assessment. The district court's construction of MCP's responsibility vis-a-vis persons with the handicap Nathanson claimed was too limited. Moreover, we find relevant two issues of material fact as to whether MCP met its legal obligations under the Act: 1) Did MCP have reason to know that Nathanson's condition was a handicap, and 2) did MCP provide reasonable accommodations for Na-

thanson's handicap. Therefore, summary judgment was inappropriate on whether Nathanson was "denied benefits" or "subject to discrimination."

### A. Did MCP Have Reason to Know That Nathanson's Condition Was A Handicap?

In order to be liable under the Rehabilitation Act, MCP must know or be reasonably expected to know of Nathanson's handicap. Neither the Rehabilitation Act nor the regulations specifies what notification is necessary to adequately inform a recipient of a person's handicap or what constitutes awareness of a handicap.

We begin with the statute. In 1974, Congress amended the definition of the term "individual with handicaps" in order to ensure that § 504 would be broadly interpreted. See Cook, The Scope of the Right to Meaningful Access and the Defense of Undue Burdens under Disability Civil Rights Laws, 20 Loy. L.A.L. Rev. 1471, 1479 (1987) (discussing the legislative history and broadening of § 504's coverage). Under the Act, a "handicapped individual" is "any person who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment." 29 U.S.C. § 706(8)(B) (1988). The regulations define "major life activities" as "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 45 C.F.R. § 84.3(j)(2)(ii) (1990).

In this case, Nathanson's handicap was not visibly obvious. The district court found that Nathanson never sufficiently demonstrated to MCP that one of her "major life activities" was impaired. Therefore, MCP had no reason to know that she was handicapped. The district court also found that Nathanson never made a suffi-

ciently direct and specific request for special accommodations that would have put MCP on notice of her handicap. Of course, this would be relevant only if MCP neither knew nor had reason to know that Nathanson was handicapped.

We believe there is sufficient evidence to create a material issue of fact whether MCP knew or had reason to know that Nathanson met the standards of a "handicapped individual" under § 706(8)(B)(i) and (ii). With regard to § 706(8)(B)(i), Nathanson's meeting with Beasley on September 12, 1985, their depictions of this meeting, and her letter to him the next day, raised a factual issue whether Nathanson's "physical impairment," her neck and back injuries, "substantially limited" one of her "major life activities," which was "learning." Beasley's affidavit stated that Nathanson's physical difficulties precluded her from attending classes at MCP for the next academic year. Moreover, Nathanson's letter of September 13, 1985, requesting permission to defer classes for one year "because of the increased pain and spasm" that she had been experiencing, documented that she believed that her handicap was interfering with her learning. Letter from Jayne G. Nathanson to Dr. Andrew Beasley (Sept. 13, 1985).

With regard to § 706(8)(B)(ii),[11] there was sufficient evidence to create a material issue of fact whether Nathanson had a "record of impairment." Nathanson wrote Beasley that:

> I had been in a car accident several years ago, injuring my neck, back, and shoulders and have made major strides in terms of recovery each year. Based upon my performance under a full-time load last spring [at Penn], I truly believed that I was physically prepared to handle the burden of a medical curriculum. Sadly this has not been so, each day the situation has worsened in terms

---

11. Whether an individual "is regarded as having such an impairment" under § 706(8)(B)(iii) (1988), is not applicable to this case. This standard applies to an individual who does not have a physical or mental impairment that substantially limits one or more major life activities and also does not have a record of such an impairment, but is nonetheless an individual with handicaps because he is regarded by others as having such an impairment. 45 C.F.R. § 84.3(j)(2)(iv) (1990).

of my pain and fatigue and I do not believe my physical condition is good enough to proceed [in attending classes at MCP] successfully.

Letter from Jayne G. Nathanson to Dr. Andrew Beasley (Sept. 13, 1985).

■ A person with a record of impairment can still qualify as a handicapped individual even if that individual's impairment does not presently limit one or more of that person's major life activities. Thus, for example, a person who has recovered from a history of mental or emotional illness, heart disease, or cancer may always be a handicapped individual under the statute. 45 C.F.R., pt. 84, App. A. (1990). Nathanson described to MCP that she had expanded her course load at Penn and at Temple over the years since her injury in part to test and prepare for the endurance needed to handle a fulltime course load in medical school. Thus, her statements created an issue of fact concerning whether she notified MCP that she had a record of impairment that "substantially limited" one of her "major life activities," learning. 45 C.F.R. § 84.3(j)(2)(ii) (1990). *See also Doe v. New York Univ.*, 666 F.2d 761, 777–78 (2d Cir.1981) (noting that a long history of mental impairments, regardless of several years of stable behavior and a commendable work record, indicated that former medical student was a handicapped individual).

MCP contends that it could not have reasonably known about Nathanson's record of impairment because she indicated at her preadmission interviews that she would not require special accommodations at MCP because she had "never had a problem" with her seating arrangements during her prior course work at Temple and Penn. Moreover, the regulations specifically prohibit schools that receive federal funds from asking if an applicant is handicapped although they may do so confidentially after an individual has been admitted for purposes of accommodation. 45 C.F.R. § 84.42(b)(4) (1990). However, as we have noted, there is sufficient evidence to create an issue of fact about whether Nathanson gave notice of her record of impairment after she was admitted to MCP.

Furthermore, it appears that there was a disputed fact whether Nathanson made a specific request for accommodations before August 21, 1986. There is some evidence that Nathanson did ask for direct help with her accommodations at least three times during the course of the year: in her September 12, 1985 meeting with Beasley (although the specificity of her request is in dispute), in her August 21, 1986 meeting with Beasley and Hartman, and in her September 3, 1986 meeting with Beasley. The evidence is less clear whether Nathanson asked for help in her encounter with Beasley in June 1986 because Nathanson and Beasley presented conflicting accounts about even the content of the conversation.

It is also less clear that Nathanson's May 27, 1986 meeting or correspondence constituted direct requests for help because she indicated that she was assuming the burden of finding accommodations. Moreover, Nathanson conceded in her deposition that she did not expect help and that she had given the impression in her May 27 letter that she would contact Beasley. However, in both her conversation and letter of May 27, Nathanson had reiterated her concern with the facilities at MCP and, in her letter, suggested that she and Beasley speak further. These communications, therefore, are sufficient to create an issue of fact about whether MCP was put on notice that Nathanson's handicap could still pose a substantial limitation on her ability to learn.

In contrast, Beasley claimed that "at no time then or at any time since" did Nathanson request specific accommodations. However, he did state that Nathanson had explained to him in their September 12, 1985, meeting that her physical difficulties would preclude her from attending MCP. App. 209. Moreover, he also stated that his meeting with Nathanson on August 21, 1986, was the "first time" that Nathanson "had indicated in any way that she wanted MCP to do anything for her [by way of] seating arrangements." App. 213. In general, then, we find some evidence that Na-

thanson made known that she had difficulty in "learning," that her handicap prevented her from attending classes, and that she made direct requests for accommodations. Therefore, we believe that there is a disputed issue of material fact whether MCP knew or reasonably should have known that Nathanson met the standards for a handicapped individual under the Act.

### B. Did MCP Provide Reasonable Accommodations for Nathanson's Handicap?

For individuals in Nathanson's position, the regulations implement the reasonable accommodation standard under § 504 as follows:

> A recipient [of federal funds] shall make reasonable accommodation to the known physical or mental limitations of an otherwise qualified handicapped applicant or employee unless the recipient can demonstrate that the accommodation would impose an undue hardship on the operation of its program.

45 C.F.R. § 84.12(a) (1990).

The standard for reasonable accommodation was first set forth in *Southeastern Community College v. Davis*, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979), where the Court stated that the administrative regulations implementing § 504 are entitled to judicial deference if they correspond to the "clear meaning of [the] statute, as revealed by its language, purpose, and history." *Id.* at 411, 99 S.Ct. at 2369. In *Southeastern*, the plaintiff was denied admission to the defendant's nursing school program because her severe hearing disability "made it impossible" for her to participate safely in the normal clinical training program or to care adequately for patients. She contended that, under § 504, the nursing program should have to "undertake affirmative action that would dispense with the need for effective oral communication." *Id.* at 407, 99 S.Ct. at 2368.

In affirming the district court's grant of summary judgment for the defendant, the Court concluded that § 504 requires that an "otherwise qualified handicapped individual" must be given meaningful access to the benefits of a federally funded program. *Id.* at 406, 99 S.Ct. at 2367. Moreover, a recipient's refusal to modify a program may be unreasonable, and therefore a violation of § 504, if the modification would not entail an undue financial or administrative burden. *Id.* at 412–13, 99 S.Ct. at 2370. However, § 504 (unlike §§ 501(b) and 503(a)) of the Rehabilitation Act does not impose an "affirmative action" obligation on all recipients of federal funds if the required changes would be considered too burdensome. *Id.* at 411, 99 S.Ct. at 2369. Therefore, the Court found that the defendant nursing program's requirement for certain physical qualifications was legitimate because to change it would fundamentally alter the curriculum. Because the plaintiff could not meet the program's requirements, then, she was not "otherwise qualified" under § 504 and the defendant's decision to exclude her was not discriminatory.

*Southeastern* did not make clear whether an educational institution has a duty to make "reasonable efforts to explore feasible alternative modifications" in order to accommodate a handicapped person. *See* Note, *Accommodating the Handicapped: Rehabilitating Section 504 after Southeastern*, 80 Colum.L.Rev. 171, 188 n. 118 (1980). It appears that the Court stated only that § 504 "does not require a school to provide services to a handicapped individual for a program for which the individual's handicap precludes him from ever realizing the principal benefits of the training." *Camenisch v. University of Texas*, 616 F.2d 127, 133 (5th Cir.1980), *vacated and remanded on other grounds*, 451 U.S. 390, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981).

*Alexander v. Choate*, 469 U.S. 287, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985) extended and clarified *Southeastern*. In *Alexander*, handicapped citizens of Tennessee brought a class action claiming that the state's reduction in the number of inpatient hospital days funded by Medicaid would have a disparate impact on handicapped persons because they required relatively longer hospital stays. *Id.* at 289–90, 105 S.Ct. at 714–15. The Court held that the state's

reduction did not exclude handicapped individuals from, or deny them meaningful access to, Medicaid's benefits. Moreover, the reduction was neutral on its face and did not rely on a discriminatory motive. *Id.* at 309, 105 S.Ct. at 724.

■ In so holding, however, the *Alexander* Court also made clear two points. First, the Court emphasized that the Rehabilitation Act was directed particularly at unintentional conduct because "[d]iscrimination against the handicapped was perceived by Congress to be most often the product, not of invidious animus, but rather of thoughtlessness and indifference—of benign neglect." *Id.* at 295, 105 S.Ct. at 717. Thus, a plaintiff need not establish that there has been an intent to discriminate in order to prevail under § 504. *Alexander,* 469 U.S. at 295–97, 105 S.Ct. at 717–18 (1985); *see also NAACP v. Medical Center, Inc.,* 657 F.2d 1322, 1331–32 (3d Cir. 1981) (noting that § 504 pertains to disparate-impact discrimination, whether or not it is intentional). Second, the Court noted that *Southeastern's* use of the terms "affirmative action" refers to "those 'changes,' 'adjustments,' or 'modifications' to existing programs that would be 'substantial' . . . or that would constitute 'fundamental alteration[s] in the nature of a program' . . . rather than to those changes that would be reasonable accommodations." *Alexander,* 469 U.S. at 301 n. 20, 105 S.Ct. at 720 n. 20.

Thus, in both *Southeastern* and *Alexander,* the Court refused to mandate alterations only because they were "substantial." The two cases therefore "contemplate a continuum in which some modest modifications may be necessary to avoid discrimination but other more substantial modifications are not required by section 504." *Americans Disabled for Accessible Public Transp. v. Skinner,* 881 F.2d 1184, 1192 (3d Cir.1989) (holding that § 504 does not

mandate mainstreaming for the disabled in public transportation).

Much of the case law interpreting § 504 relates to circumstances like those in *Southeastern* where a plaintiff claims denial of admission into a program because of a handicap. *Southeastern's* holding was particularly stringent because the admission standards were designed to protect public health and safety, a concern that has been given considerable deference by the courts. *See* Wegner, *The Antidiscrimination Model Reconsidered: Ensuring Equal Opportunity Without Respect to Handicap under Section 504 of the Rehabilitation Act of 1973,* 69 Cornell L.Rev. 401, 476–78 (1984).

Nathanson does not typify those handicapped individuals to which the "reasonable accommodation" standard in *Southeastern* was directed because that standard was designed to clarify whether an individual was "otherwise qualified" for a program. *See, e.g., Doherty v. Southern College of Optometry,* 862 F.2d 570, 575 (6th Cir. 1988), *cert. denied,* —— U.S. ——, 110 S.Ct. 53, 107 L.Ed.2d 22 (1989) ("An educational institution is not required to accommodate a handicapped individual by eliminating a course requirement which is reasonably necessary to proper use of the degree conferred at the end of a course of study."). This distinction is important because Nathanson's case involves alleged discrimination or denial to a handicapped individual who has already been admitted to a program and deemed to be "otherwise qualified" but who requests individual accommodation in order to have access to or to continue benefitting from the program. *See id.* (noting the trial court's error in "treating the reasonable accommodation question as separate from the otherwise qualified analysis"). Moreover, Nathanson's request does not relate to concerns of public safety involving others and does not require the kind of alteration found in *Southeastern* or *Alexander.*[12]

---

12. We also agree with the district court that Nathanson did not establish a *prima facie* case of discriminatory animus. *Nathanson,* slip op. at 4; *see also P.C. v. McLaughlin,* 913 F.2d 1033, 1041 (2d Cir.1990) (emphasizing, in a § 504

case, the "complete absence of any factual support in the record to substantiate the bare allegation that a discriminatory animus prompted the treatment [plaintiff] received").

As we have noted, the regulations require that a recipient make reasonable accommodation to the "known physical or mental limitations" of otherwise qualified individuals like Nathanson unless the recipient can show that the accommodation "would impose undue hardship on the operation of its program." 45 C.F.R. § 84.12(a) (1990). We find nothing inconsistent between the regulations and the Supreme Court holdings that we have reviewed. The *Alexander* Court's interpretation of *Southeastern* suggests that, indirectly, such a duty for reasonable accommodation under § 504 may exist: "[W]hile a grantee need not be required to make 'fundamental' or 'substantial' modifications to accommodate the handicapped, it may be required to make 'reasonable ones.' " *Alexander*, 469 U.S. at 300, 105 S.Ct. at 720.

What is considered to be a "reasonable accommodation" of course must be decided on a case-by-case basis. The limited case law that has attempted to delineate a "reasonable accommodation" standard, however, is instructive. *See, e.g., American Pub. Transit Ass'n v. Lewis*, 655 F.2d 1272, 1278 (D.C.Cir.1981) (asserting that a "refusal to take modest, affirmative steps to accommodate handicapped persons might well violate section 504"); *Majors v. Housing Auth. of DeKalb*, 652 F.2d 454, 457–58 (5th Cir.1981) (stating that a tenant could experience the "full benefit" of federally subsidized housing given that there is some accommodation made for the tenant's disability); *see also David H. v. Spring Branch Indep. School Dist.*, 569 F.Supp. 1324, 1336 (S.D.Texas 1983) ("After considering the legislative intent and the relation of Section 504 with constitutional law and with Title VI [of the Civil Rights Act of 1964], the Court concludes that defendants ... had the affirmative duty to investigate [child-plaintiff's] individual needs to determine what special or additional services

would be needed and then to set about to provide those services."); *Schuett Inv. Co. v. Anderson*, 386 N.W.2d 249, 253 (Minn. Ct.App.1986) (stating that § 504 "requires some affirmative steps to accommodate handicapped persons").

Therefore, if MCP's failure to provide a suitable seating arrangement makes its program effectively unavailable to a student with a back injury, then that failure could constitute the type of "benign neglect" referred to in Alexander and a violation of the Rehabilitation Act. MCP would have to show that the required modification entails a substantial alteration in order to avoid a violation of the Act.

Despite Nathanson's conflicting messages over the course of the year and despite her change of expectations from MCP, we believe the following to be disputed issues of fact: 1) whether Nathanson left school before MCP had an opportunity to reasonably accommodate her; 2) whether Nathanson assumed the responsibility for finding her own accommodations after her meeting with Beasley on September 12, 1985; and 3) whether MCP made a reasonable effort to accommodate Nathanson even after August 21, 1986, the date that MCP claimed that it first became aware that Nathanson was handicapped.

■ The district court construed the statute to require that MCP "need only make it possible for [Nathanson] to have 'access' to the building, her classes and other facilities." *Nathanson*, slip op. at 4. The court believed that MCP need not make Nathanson "comfortable," and commented that Nathanson "had access to the facilities and building." As is evident from the regulations, a defendant's obligation goes further than making the building and physical facilities accessible.

The cases cited by Nathanson contending that MCP has a duty or burden to reasonably accommodate her refer to § 501 of the Act, which concerns a federal agency's duty to "submit an affirmative action program plan for hiring ... individuals with handicaps." 29 U.S.C. § 791(b). These cases are not relevant here. In turn, MCP's references to the reasonable accom-

modation policies for religious needs under Title VII of the Civil Rights Act are also not directly on point. *See, e.g., United States v. Board of Educ.*, 911 F.2d 882, 894 (3d Cir.1990) (rejecting a Title VII claim to allow a public school teacher to wear religious attire during her job).

We note that MCP would not have been in legal jeopardy for seeking more information from Nathanson because the regulations provide that a recipient "may make inquiries [from handicapped individuals] on a confidential basis as to handicaps that may require accommodation." 45 C.F.R. § 84.42(b)(4) (1990). Furthermore, the regulations state that recipients of federal funds are obligated to provide the types of auxiliary aids that Nathanson requested, therefore enabling reasonable accommodation inside a building as well as access outside.

> (d) *Auxiliary aids.* (1) A recipient to which this subpart applies *shall take such steps as are necessary* to ensure that no handicapped student is denied the benefits of, excluded from participation in, or otherwise subjected to discrimination under the education program or activity operated by the recipient because of the absence of educational auxiliary aids for students with impaired sensory, manual, or speaking skills.
>
> (2) Auxiliary aids may include taped texts, interpreters or other effective methods of making orally delivered materials available to students with hearing impairments, readers in libraries for visual impairments, *classroom equipment adapted for use by students with manual impairments,* and other similar services and actions. Recipients need not provide attendants, individually prescribed devices, readers for personal use or study, or other devices or services of a personal nature.

45 C.F.R. § 84.44(d) (1990) (emphasis added).

Nathanson requested closer parking and a straight back chair which, she emphasized, did not need to be specifically designed for her. It is therefore a disputed issue of fact whether Nathanson needed "reasonable" accommodations that would not cause "undue financial or administrative burdens" or "impose an undue hardship" upon the functioning of the recipient's program. *Alexander,* 469 U.S. at 287, 105 S.Ct. at 712; *Southeastern,* 442 U.S. at 397, 99 S.Ct. at 2361; 45 C.F.R. § 84.12(a) (1990). A district court's esti-

mate of what is reasonable "rests in large part upon factual determinations." *United States v. Board of Trustees for Univ. of Ala.,* 908 F.2d 740, 750 (11th Cir.1990). In turn, the regulations suggest the following "factors to be considered" in determining whether an accommodation would create an undue hardship:

> (1) The overall size of the recipient's program with respect to the number of employees, number and type of facilities, and size of budget;
>
> (2) The type of the recipient's operation, including the composition and structure of the recipient's workforce; and
>
> (3) The nature and cost of the accommodation needed.

45 C.F.R. § 84.12(c)(1–3) (1990); *see also Nelson v. Thornburgh,* 567 F.Supp. 369, 379–80 (E.D.Pa.1983), *cert. denied,* 469 U.S. 1188, 105 S.Ct. 955, 83 L.Ed.2d 962 (1985) (analyzing those factors to be considered in determining what would constitute an "undue burden" under § 504).

■ Accommodations that are "reasonable" must not unduly strain financial resources. Furthermore, a recipient must be allotted sufficient time and opportunity to investigate and acquire accommodations if appropriate. However, we believe there are disputed issues of fact whether MCP provided Nathanson with reasonable accommodations and whether MCP evidenced the type of "benign neglect" referred to in *Alexander.* These matters must be resolved by the factfinder.

In summary, we find that the following disputed issues of fact remain: 1) whether MCP knew or had reason to know that Nathanson's condition was a handicap either because her condition "substantially limited" her ability to learn or because she had a "record of impairment"; 2) whether Nathanson made a sufficiently direct and specific request for special accommodations in either of her three meetings with Beasley (on September 12, 1985, August 21, 1986, or September 3, 1986) that would have put MCP on notice of Nathanson's handicap if MCP neither knew nor had reason to know that Nathanson was handicapped; 3) whether MCP's failure to pro-

vide Nathanson with "reasonable accommodations" in the form of a suitable seating arrangement constituted "benign neglect" and effectively made its program unavailable to her; 4) whether Nathanson gave MCP a fair opportunity to provide the necessary reasonable accommodations; and 5) whether MCP demonstrated that the modifications that Nathanson had requested imposed an "undue hardship," a "financial or administrative burden," or a sufficiently "substantial alteration" to the functioning of MCP's program.[13]

## IV. TORTIOUS INTERFERENCE WITH EXISTING AND PROSPECTIVE CONTRACTS

Nathanson made three allegations with regard to MCP's alleged tortious interference of her existing and prospective contracts: 1) MCP violated § 504 by interfering with Nathanson's acceptance at Georgetown by advising Georgetown of her previous matriculation and attendance at MCP; 2) MCP violated Pennsylvania law by interfering with Nathanson's contractual relationship with Georgetown in 1986; and 3) MCP violated Pennsylvania law by interfering with Nathanson's prospective relationship with other medical schools in subsequent years. For the reasons outlined below, we will affirm the district court's grant of summary judgment in favor of MCP on these three counts.

### A. *MCP Did Not Violate Section 504 by Interfering With Nathanson's Acceptance at Georgetown*

■ According to Nathanson, MCP violated § 504 when it notified Georgetown

that she had a position in MCP's entering class. This notification led Georgetown to withdraw its offer of acceptance and thereby foreclosed Nathanson's attempt to accommodate her disability by applying to other medical schools with more comfortable chairs and closer parking facilities. Thus, Nathanson argued that MCP "intentionally attempted to prevent [her] from receiving a medical degree by ... blocking her efforts to gain admission to other medical schools." *Nathanson,* slip op. at 4.

The district court correctly held that Nathanson's claim is not recognized under the Rehabilitation Act: "No portion of the Act addresses a party's interference with a handicapped individual's participation in the program of a third party." *Id.* Moreover, Nathanson failed to provide any case law or facts to support her proposition.

In response, Nathanson argued that her claim is based upon the Program Accessibility requirements under 45 C.F.R. § 84.22(a)(b) (1990). As MCP correctly points out, however, this regulation requires only that recipients of federal assistance adhere to methods for making their own programs accessible to handicapped persons.

### B. *MCP Did Not Violate Pennsylvania Law by Interfering With Nathanson's Contractual Relationship with Georgetown in 1986*

■ Nathanson's claim of tortious interference with an existing contractual relationship was based upon her contention

---

**13.** We believe that the dissent has resolved several issues of disputed fact. For example, the dissent concluded that in September, 1985, Nathanson "could not have used the chair" when she first requested it, that she "could not have continued" in the program had she had the chair, and that Nathanson's letter to Beasley on May 27, 1986, "unmistakably suggests that her request for a deferral was dictated by health problems that could not have been solved simply by providing a different chair." We believe, however, that few if any Rehabilitation Act cases would survive summary judgment if such an analysis were applied to each handicapped individual's request for accommodations. Under the dissent's approach, an institution could

justify rejecting an "otherwise qualified" applicant's reasonable request by rationalizing that even if such accommodations were provided, the applicant still might not be able to continue in a particular program and thus would eventually withdraw.

There is evidence in the record to suggest that Nathanson successfully attended medical school courses both immediately before and after her attendance at MCP. Therefore, Nathanson provided sufficient evidence to raise a genuine issue of material fact about whether her unproblematic attendance elsewhere, and her problems at MCP, were attributed to the differences in seating arrangements.

that MCP's communications with Georgetown were "clearly intended to interfere" with her contract for admission to Georgetown in 1986 and subsequently led Georgetown to breach its contract with Nathanson. Nathanson's claim of tortious interference with prospective contractual relationships was based on MCP's alleged interference with her applications to other medical schools in 1987 and 1989 by its insistence that Nathanson matriculated at MCP in 1985.

The Pennsylvania Supreme Court has explicitly adopted the standard of the Restatement (Second) of Torts § 766 (1979) for determining the elements for tortious interference with existing contractual relationships. *United States Healthcare, Inc. v. Blue Cross*, 898 F.2d 914, 925 (3d Cir. 1990); *Silver v. Mendel*, 894 F.2d 598, 601 (3d Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 2620, 110 L.Ed.2d 641 (1990); *Tose v. First Pa. Bank, N.A.*, 648 F.2d 879, 898 (3d Cir.), *cert. denied*, 454 U.S. 893, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981); *Adler, Barish, Daniels, Levin and Creskoff v. Epstein*, 482 Pa. 416, 429–31, 393 A.2d 1175, 1181–83 (1978), *cert. denied*, 442 U.S. 907, 99 S.Ct. 2817, 61 L.Ed.2d 272 (1979). The Restatement (Second) provides:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the third person's failure to perform the contract.

*Adler, Barish*, 482 Pa. at 431, 393 A.2d at 1183.[14]

■ Thus, in order to prevail on her claim for intentional interference with a contract, Nathanson must show that (1) she had a contract with Georgetown, (2) MCP's communications with Georgetown were intended to induce or cause Georgetown to break its contract with her, and (3) MCP

acted improperly. Nathanson bears the burden of proving all three elements. *See Buczek v. First Nat'l Bank of Mifflintown*, 366 Pa.Super. 551, 557, 531 A.2d 1122, 1124 (1987).

For the purposes of its analysis, the district court assumed that Nathanson had a valid contract with Georgetown, *Nathanson*, slip op. at 5 n. 1, and that MCP "informed Georgetown that [Nathanson] matriculated at MCP in order to prevent Georgetown from confirming its acceptance of [Nathanson]." *Nathanson*, slip op. at 5. However, the court found that MCP's disclosure to Georgetown of Nathanson's prior matriculation and attendance at MCP was proper since MCP was simply protecting its own contractual interest. As the district court noted,

> "[e]nforcing or complying with one's own valid contract does not constitute unjustifiable interference with another's contract. An action to protect one's contractual right is also ordinarily justification for interference with another's contract." [*McCartney v. Dunn & Conner, Inc.*, 386 Pa.Super. 563, 572, 563 A.2d 525, 530 (1989).] Therefore, if a contract existed between MCP and plaintiff MCP was justified in its interference with plaintiff's contract with Georgetown.

*Nathanson*, slip op. at 5.

The district court concluded that a contract between Nathanson and MCP existed because MCP would provide Nathanson with a seat in its 1986 entering class. Therefore, MCP was "justified in informing Georgetown of its interests" and its conduct was therefore proper. *Id.* at 6.

■ In determining whether or not an actor's conduct has been "proper," the Pennsylvania courts are guided by the following factors derived from the Restatement (Second) of Torts § 767 (1979).

(a) the nature of the actor's conduct,

(b) the actor's motive,

(c) the interests of the other with which the actor's conduct interferes,

---

**14.** The *Adler, Barish* court used language from the Restatement (Second) of Torts § 766 (Tent. Draft No. 23, 1977). However, the "final restatement is the same in substance." *United States Healthcare*, 898 F.2d at 925 n. 12.

(d) the interests sought to be advanced by the actor,

(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,

(f) the proximity or remoteness of the actor's conduct to the interference and

(g) the relations between the parties.

*Adler, Barish,* 482 Pa. at 433, 393 A.2d at 1184; *Yaindl v. Ingersoll–Rand Co.,* 281 Pa.Super. 560, 573–74, 422 A.2d 611, 618 (1980). The district court's grant of summary judgment emphasized the fourth factor (d), concerning MCP's own contract interest, citing as support *McCartney v. Dunn & Conner, Inc.,* 386 Pa.Super. 563, 572, 563 A.2d 525, 530 (1989).[15]

In response, Nathanson presented three arguments which she contended demonstrated that the district court's decision improperly resolved several disputed issues of fact. We find, however, that each of Nathanson's arguments was either resolved in Nathanson's favor by the court or was not material to the court's decision.

First, Nathanson contended that there was a factual dispute concerning whether or not she had a valid contract with Georgetown. However, the district court resolved this issue in her favor.

Second, Nathanson argued that three alleged statements by MCP to Georgetown were not true and therefore are disputed factual issues: 1) whether she "matriculated" at MCP in September 1985; 2) whether she requested and was granted a leave of absence from MCP; and 3) whether she made "misrepresentations" on her AMCAS application. Nathanson is correct in noting that the parties did dispute these issues because MCP contended that its statements to Georgetown were indeed truthful and that summary judgment would have been appropriate for this reason. However, the district court's decision was based not upon whether these statements were truthful

but instead upon its conclusion that MCP's communications with Georgetown were proper because MCP was protecting its own contract interest. *Nathanson,* slip op. at 6. Regardless, even if the veracity of MCP's statements are considered to be material, Nathanson did not present sufficient evidence to create an issue of fact about whether they were false.

### 1. Nathanson Matriculated at MCP

Nathanson contended that there is a dispute about whether she matriculated at MCP in September 1985. The district court found that she did matriculate based upon the following undisputed facts: 1) Nathanson had applied and been accepted as a candidate for the M.D. degree, 2) she had attended orientation, 3) she registered for and attended classes for four days, and 4) she signed MCP's Honor Code that described how "students of the Medical College of Pennsylvania agree to hold themselves." *Id.* at 6. In addition, Nathanson had completed a personal data form and filed it with MCP's registrar, was given a locker and a mailbox (App. 209), and had her picture taken for her student ID card. Brief for Appellee at 37.

Moreover, there is evidence to support Nathanson's matriculation status based upon her own selection of a definition of matriculation provided by Webster's Third New International Dictionary:

*Matriculate*–1. To admit to membership in a body, society, or institution especially a college or university by entering the name in a register: ENROLL ... 2. To become admitted to membership in a body, society, or institution (as a college or university) and have one's name officially registered after having previously met entrance requirements and typically after having successfully passed an entrance examination.

*Webster's Third New International Dictionary* 1393 (P. Gove Ed. 1986). In line with this definition, the undisputed facts

---

**15.** *McCartney's* conclusion was based upon an application of Texas law. However, MCP argues persuasively that it is likely that Pennsylvania courts would reach a similar conclusion because Texas has also adopted the Restate-ment's definition of the tort of intentional interference with contract. *See, e.g., Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 689 (Tex.1989); *Maynard v. Caballero,* 752 S.W.2d 719, 721 (Tex. App.1988).

show that Nathanson was "admitted" to MCP as a degree candidate, she "officially registered after having previously met entrance requirements," and she attended an orientation session and classes in September 1985.

Nathanson argued that she did not matriculate because: 1) she only attended four days of classes at MCP, 2) she had taken no exams and had completed no academic work, and 3) she was never billed for nor paid any fees or tuition to MCP although MCP's Student Bulletin states that any matriculated student is obligated for full payment of all fees and tuition. The Bulletin further states that students who matriculate but withdraw or are granted leaves-of-absences are obligated to pay at least 25 percent of the tuition and fees.

However, as MCP notes, MCP's Handbook of Information for Students, 1985–86, states in its section on "Matriculation Requirements" that there are two requirements for matriculation for new students: submitting two photographs and official transcripts from prior institutions. Nathanson completed both of these requirements. Brief for Appellee at 38. In turn, MCP had not yet billed Nathanson for tuition because she was admitted unusually late into the program (ten days prior to orientation) and MCP was subsequently able to fill her seat in September 1985 with another student.

Thus, this one exception to the written criteria for matriculation (no tuition), which benefitted Nathanson, is not sufficient to create an issue of fact. As the district court concluded, in light of the other matriculation-related factors that Nathanson did not contest, "plaintiff and defendant had entered into a contract." *Nathanson,* slip op. at 6. Nathanson's matriculation status, then, is well documented.

### 2. Nathanson was Granted a Leave of Absence

Although Nathanson originally requested a "deferral," she accepted the "leave of absence" that was granted to her in Beasley's letter after having questioned Beasley about the distinction between the two

terms. Moreover, Nathanson never contested her status or request that it be changed, either verbally or in writing, and gave no indication in her deposition that she had any particular reason for why she would want a status of deferral over a leave of absence.

As MCP explained, Nathanson's initial request for a deferral was, regardless, an inappropriate use of terms because Nathanson had already started taking classes; "leave of absence" was the proper term for a student in her position. This distinction between terms is commonly accepted and understood in the field of education. App. 210. Furthermore, Beasley sent to Georgetown copies of Nathanson's letter of September 13, 1985 requesting a "deferral" and his letter of the same date granting her a "leave of absence." In this way, Beasley had not misrepresented the situation to Georgetown. Furthermore, Nathanson informed Georgetown about the differences in terminology. App. 289.

Similarly, the district court saw the leave-of-absence issue as supporting MCP's attempt to protect its contract interest.

> Defendant's grant of plaintiff's leave of absence did not release plaintiff from her obligation to defendant. She could have informed defendant that she was no longer interested in attending MCP prior to accepting Georgetown's offer. Instead, she accepted Georgetown's offer while reaffirming her relationship with MCP. Plaintiff's leave of absence suggests, by definition, that her relationship with MCP was ongoing. This is evident because plaintiff did not have to apply to MCP to gain admission in the entering class of 1986. Whether plaintiff believed such behavior to be inappropriate is irrelevant. Defendant acted in its contractual interests and, therefore, its conduct is not actionable.

*Nathanson,* slip op. at 6.

### 3. Whether or Not Nathanson Made Misrepresentations On Her 1986 AMCAS Form Is Not Material

Nathanson is correct in stating that the parties dispute whether she made misrepre-

sentations on her AMCAS form because she had designated that she had not matriculated at nor attended any medical school. She concedes, however, that this issue is only relevant to determine whether MCP's communications with Georgetown were truthful and therefore proper. Brief for Appellant at 37. However, as we have noted, the district court's decision was based not upon whether these statements were truthful (although MCP contends that they were) but upon its conclusion that MCP's communications with Georgetown were proper because MCP was protecting its own contract interest. Again, even if the truthfulness of MCP's statements were considered to be material, Nathanson did not present sufficient evidence to create an issue of fact about whether they were false.

Nathanson also failed to present adequate evidence that MCP tortiously interfered with her contractual relationship with Georgetown. It appears that MCP was simply complying with the standard "traffic rules" followed by medical schools for their application procedures. In this regard, the Medical School Admission Requirements provide:

> Subsequent to June 1, a medical school seeking to admit an applicant already known to be accepted by another school for that entering class should advise that school of its intent. Because of the administrative problems involved in filling a place vacated just prior to the commencement of the academic year, schools should communicate fully with each other with respect to anticipated late roster changes in order to keep misunderstandings at a minimum.

Association of American Medical Colleges, *Medical School Admission Requirements* ¶ 8 (1986–87).

Moreover, when Beasley learned of Nathanson's acceptance by Georgetown from his secretary's review of the AMCAS computer printout, he was not obligated to have contacted Nathanson before he contacted Georgetown. Beasley explained that it was a "unique circumstance" to have a student on leave of absence who

was holding a place at another medical school for the fall. App. 90, 94. Moreover, he referred to the procedure quoted above in his further explanation that it was "quite routine" after June 1 in any admissions cycle for "immediate" telephone communications to exist among medical schools if a student was holding an acceptance at more than one school. App. 94.

There is also no evidence to suggest that Beasley tortiously interfered with Nathanson's contract with Georgetown when he informed Georgetown on August 12, just two days before classes were to begin there, that MCP had no objection if Georgetown accepted Nathanson for its 1986–87 entering class. Beasley contacted Georgetown one day after MCP convened its Student Promotions Committee to review Nathanson's case so that his call corresponded with his knowledge of Nathanson's status at MCP at that time. Moreover, it appears that Nathanson had not yet provided Georgetown with the financial aid information that it needed in order to prepare for her matriculation. It cannot be properly inferred that meetings and telephone conversations were purposefully delayed.

Similarly, Beasley's call to Nathanson on September 2, 1986, informing her that she had been reinstated at MCP and that classes were to begin there the next day occurred directly after the Promotions Committee had met to discuss Nathanson's case. Nathanson herself had suggested the original delay of that meeting (that had initially been scheduled for August 25) so that her attorney could review her case. There is also no evidence to suggest that MCP attempted to interfere with Nathanson's start of her classes there.

C. *MCP Did Not Violate Pennsylvania Law by Interfering With Nathanson's Prospective Relationship With Other Medical Schools*

██ According to Nathanson, MCP interfered with her admission to medical schools to which she applied in 1987 and 1989 by insisting that she matriculated at MCP in 1985. She contends that the disclosure of her matriculation hindered her

chances of gaining admission to those schools.

The district court properly noted that a claim for intentional tortious interference with prospective contractual relationships requires that a plaintiff establish the following four elements:

(1) a prospective contractual relation;

(2) the purpose or intent to harm the plaintiff by preventing the relation from occurring;

(3) the absence of privilege or justification on the part of the defendant; and

(4) the occasioning of actual damage resulting from the defendant's conduct.

*Thompson Coal Co. v. Pike Coal Co.*, 488 Pa. 198, 208, 412 A.2d 466, 471 (1979).

Relying on *Thompson Coal*, the district court defined a "prospective contractual relationship" as "something less than a right and something more than hope." *Id.* at 209, 412 A.2d at 471. In order to prove the existence of a prospective contractual relationship, Nathanson must show that there was a "reasonable probability" that she would have entered into a contract with another medical school absent MCP's interference. *General Sound Tel. Co. v. AT & T Communications, Inc.*, 654 F.Supp. 1562, 1565 (E.D.Pa.1987). The district court concluded that although Nathanson had a "satisfactory academic record and background," she had "not demonstrated more than mere hope in securing a prospective relationship with a medical school." *Nathanson*, slip op. at 6. Moreover, Nathanson had "not offered any facts to show that she had a reasonable probability of admission to a particular medical school but for the fact that she matriculated at MCP." *Id.* at 7.

The district court conceded that it was difficult to determine whether or not Nathanson would have been accepted by a medical school. In 1985, she applied to ten medical schools and was accepted only by MCP. In 1986, she applied to six medical schools and was accepted only by Georgetown which had rejected her when she had applied there the year before. Based upon this history, it is too speculative to conclude

that she would have been accepted by any medical school in 1987 or 1989.

Admissions policies vary considerably from school-to-school and from year-to-year. Other information is simply not known. Regardless, the burden is upon Nathanson to demonstrate that her matriculation status did have an impact upon her rejections from medical schools. She did not provide sufficient evidence to create a disputed issue of material fact.

Furthermore, as the district court pointed out, "MCP cannot be held liable for AMCAS' requirement that students list [matriculation] information in applying to medical schools. [MCP] does not require that plaintiff provide this information. The fact is she did matriculate at MCP and MCP cannot be held liable for her obligation to represent that she did so." *Id.*

Contrary to Nathanson's assertions, the district court did not improperly resolve disputed issues of fact. The issues that we have reviewed were either resolved in Nathanson's favor, were not material to the district court's decision, or lacked sufficient evidence to create a disputed issue of material fact.

## V. CONCLUSION

We will affirm the district court's grant of summary judgment on the tortious interference of contract claims. However, we will reverse the grant of summary judgment on § 504 of the Rehabilitation Act and remand for proceedings consistent with this opinion.

ALITO, Circuit Judge, concurring and dissenting:

I concur in the affirmance of summary judgment in favor of the Medical College of Pennsylvania (MCP) on Nathanson's state tort claims, but I dissent from the reversal of summary judgment for MCP on Nathanson's claims under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

### I.

As the majority notes (Typescript at 26), a plaintiff asserting a claim under Section

504 must prove (1) that he or she is handicapped, (2) that he or she is "otherwise qualified" for participation in the program at issue, (3) that the program receives federal financial assistance, and (4) that he or she was "excluded from participation in," "denied the benefits of," or "subjected to discrimination" under that program. I agree with the majority that the first three elements were satisfied for present purposes, but I do not believe that Nathanson made an adequate showing with respect to the final element, which represents the heart of Section 504.

The final element of Section 504 may be satisfied by establishing that the defendant literally excluded the plaintiff from participation in its program, denied the plaintiff the benefits of its program, or subjected the plaintiff to discrimination under its program. Alternatively, the final element may be satisfied by showing that the defendant unreasonably refused to accommodate the plaintiff's handicap. *Southeastern Community College v. Davis,* 442 U.S. 397, 412–13, 99 S.Ct. 2361, 2370, 60 L.Ed.2d 980 (1979). A grantee's duty to provide "reasonable accommodation" may necessitate some special steps to meet the needs of handicapped persons, but it does not require modifications that would impose "undue financial and administrative burdens" or have a "substantial" effect on standards. *Id. See also, e.g., School Board of Nassau County v. Arline,* 480 U.S. 273, 287–88, 107 S.Ct. 1123, 1130–31, 94 L.Ed.2d 307 (1987); *Alexander v. Choate,* 469 U.S. 287, 299–302, 105 S.Ct. 712, 719–721, 83 L.Ed.2d 661 (1985); *Americans Disabled for Accessible Public Transportation v. Skinner,* 881 F.2d 1184, 1191–92 (3d Cir. 1990); *Strathie v. Department of Transportation,* 716 F.2d 227, 230–31 (3d Cir. 1983). In the present case, Nathanson's complaint rests entirely upon the theory that MCP unreasonably refused to accommodate her needs by failing to provide a suitable chair for use during classes, but the summary judgment record establishes

that MCP acted reasonably at every stage of this unusual case.

## II.

When MCP moved for summary judgment after adequate time for discovery, the district court was obligated to grant that motion unless Nathanson had made a showing sufficient to establish every critical element of her Section 504 claims. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In my view, Nathanson failed to meet this burden with respect to either of her Section 504 claims—which were based, respectively, upon her first voluntary withdrawal in the fall of 1985 and her second voluntary withdrawal in the fall of 1986.

A. *Events Leading to Nathanson's Withdrawal in the Fall of 1985.* Nathanson began classes at MCP on September 4, 1985, but stopped after September 9. On September 12, she met with Dr. Andrew Beasley, MCP's Associate Dean of Student Affairs, and orally requested a one-year deferral; she repeated this request, which MCP granted, in a letter to Dr. Beasley dated September 13. The parties strenuously contest whether Nathanson asked Dr. Beasley to provide a different kind of chair during their meeting on September 12. But even assuming that the record is sufficient to establish that Nathanson made this request, I believe that Nathanson nevertheless failed to establish that MCP acted unreasonably because she did not show that she could have continued attending classes if a suitable chair had been provided. On the contrary, her own words reveal that she could not have continued. I cannot believe that MCP's duty to provide reasonable accommodation required the school to obtain and install a special chair for a student who could not have used the chair at the time and might never have returned.[1]

Nathanson's reasons for seeking a one-year deferral were fully and unambiguously set out in her letter to Dr. Beasley,

---

1. Indeed, if Nathanson's acceptance at Georgetown University School of Medicine had not been withdrawn for reasons having nothing to do with her handicap, it is likely that she never would have returned to MCP.

which read as follows ((App. 217) (emphasis added)):

Dear Dr. Beasley:

I would like to request permission to defer beginning Freshman classes at the Medical College of Pennsylvania for one year. My reason for asking is the increased pain and spasm I have been experiencing in my neck and shoulders, since trying to attend and take notes in class for 6–7 hours per day.

I had been in a car accident several years ago, injuring my neck, back, and shoulders and have made major strides in terms of recovery each year. Based on my performance under a full-time load last spring, *I truly believed that I was physically prepared to handle the burden of a medical curriculum. Sadly this has not been so,* each day the situation has worsened in terms of my pain and fatigue and *I do not believe my physical condition is good enough to proceed successfully.*

*I do have reason to hope (based on each year's progress) that by this time next year I will recover sufficiently in strength and endurance.* In addition, before starting next fall I would have the opportunity to consider modification of my surroundings in order to reduce the strain on my neck during classes. I would, as you suggested, either formally or informally continue course work during the year to keep my knowledge current and my study skills sharp.

Thank you for your consideration.

Sincerely,

/s/ Jayne G. Nathanson

This letter fails to show that MCP's refusal to provide alternative seating necessitated Nathanson's request for a deferral. On the contrary, the letter unmistakably suggests that her request for a deferral was dictated by health problems that could not have been solved simply by providing a different chair. Nathanson unequivocally wrote: "I do not believe my physical condition is good enough to proceed successfully." She stated: "I truly believed that I was physically prepared to handle the burden of a medical curriculum. Sadly this

has not been so...." She added: "I do have reason to hope ... that by this time next year I will recover sufficiently in strength and endurance." These are Nathanson's own words, written at the time in question, and they plainly do not show that she could have continued attending classes in the fall of 1985 even if MCP had provided her with a suitable chair. Nor is there anything in Nathanson's deposition or the remainder of the summary judgment record that is sufficient to establish that she could have continued attending classes but for the lack of a suitable chair. Thus, I believe that summary judgment for MCP on her 1985 claim was required.

B. *Events Leading to Nathanson's Withdrawal in the Fall of 1986.* Nathanson's showing with respect to her 1986 claim, in my view, is also deficient. The events relating to this claim may be divided into three periods: first, the period from Nathanson's acceptance of a position in the 1986 entering class until her dismissal for ethical reasons; second, the period from dismissal until reinstatement; and third, the period from reinstatement until her second voluntary withdrawal.

1. *Acceptance to Dismissal.* During this period MCP acted reasonably, in my view, because Nathanson by her own admission had assumed full responsibility for finding and obtaining a suitable chair.

On May 27, 1986, Nathanson wrote to Dr. Beasley and informed him that she would attend MCP that fall. In this letter she stated (App. 226) (emphasis added):

In order to attend classes *it will be necessary for me to procure a special chair* for lectures and conference. *I am in the process of investigating,* whether lecture hall chairs that I have previously used elsewhere could be modified for use at MCP. I am especially concerned about the physical arrangements for conference and laboratory. In order to have a better idea of what type of installation would be appropriate, I would like to speak with you further.

Because of this passage, Nathanson stated during her deposition that it was reasonable for Dr. Beasley to assume that she did

not expect MCP to do anything about a special chair until the school heard further from her. App. 170–71. In light of this testimony, MCP's failure to attempt to obtain a special chair during this period was clearly reasonable and did not violate Section 504.[2]

2. *Dismissal to Reinstatement.* During this period, I believe that MCP had no obligation to look for, obtain, or install a special chair because Nathanson had been expelled for ethical reasons. During the summer of 1986, MCP learned that Nathanson had accepted a student spot at the Georgetown University School of Medicine, as well as at MCP. The MCP Student Promotions Committee consequently voted to dismiss her for misrepresentations and wrongful failure to disclose her acceptance of Georgetown's offer. On August 21, Nathanson met with Dr. Beasley and another member of the faculty regarding the procedure for appealing her dismissal. During this meeting, Nathanson stated that she would require special parking privileges and seating accommodations in order to attend MCP, and Dr. Beasley stated that MCP "would do the best it could do to help her." App. 213.

At this time, however, Nathanson had been dismissed for ethical reasons. As long as she remained in that status, MCP could reasonably regard her as not "otherwise qualified" to be a medical student[3] and could reasonably decline to take steps to accommodate her handicap. In my view, Section 504 plainly did not require MCP to take steps to accommodate a student it had just expelled on ethical grounds.

3. *Reinstatement to Voluntary Withdrawal.* I believe that Nathanson failed to show that MCP acted unreasonably during this final period because she failed to establish that MCP could have reasonably

accommodated her needs within the time available.

The appeal hearing, which was postponed at the request of Nathanson's attorney, took place on September 2, the day before classes were scheduled to begin. After the hearing, the Committee decided to reinstate Nathanson, and Dr. Beasley left a message at her home informing her of the decision that afternoon. On September 3, Nathanson registered at MCP. According to Nathanson's deposition, she had spoken with a chair company about ordering a special chair but had learned that her order could not be filled in less than about one month. App. 184, 186. Consequently, after registering, she approached Dr. Beasley at about 5:00 P.M. (App.187) and, according to her deposition, the following occurred. She told Dr. Beasley that she was waiting for a return call from the chair company so that she could find out whether the company had a sample that she could get immediately. App. 188. She asked Dr. Beasley whether he could help her "get some chairs and tables, whatever," for the lecture hall and conference room. *Id.* Confronted with this request for an immediate solution, Dr. Beasley told her to look around the MCP facilities and "see what [she] could find." *Id.* In her deposition, Nathanson said she looked around, found nothing suitable, and informed Beasley, who shrugged his shoulders. App. 189–90. Nathanson then went home and wrote to MCP on September 5 withdrawing from the entering class. App. 193–94, 255.

In light of these facts, I simply do not understand what MCP was supposed to have done between the time of Nathanson's reinstatement on September 2 and her conversation with Dr. Beasley on September 3 or her withdrawal on September 5. Nathanson had communicated with a chair company about ordering an acceptable

---

**2.** Nathanson's May 27 letter stated that she wanted to speak further with Dr. Beasley regarding "installation" of the "special chair" she was attempting to procure. Consistent with this statement, Nathanson stated in her deposition that she spoke with Dr. Beasley in June and asked for MCP's "help and cooperation" in installing the chair. Ap. 172–73. This testimony does not suggest that it was unreasonable for

MCP to continue to rely on her to obtain the chair.

**3.** "An otherwise qualified person is one who is able to meet all of a program's requirements in spite of his handicap." *Southeastern Community College v. Davis,* 442 U.S. at 406, 99 S.Ct. at 2367.

chair but had learned that none could be obtained in less than about a month. She presented no evidence that MCP could have obtained this chair from the company any sooner. She presented no evidence that MCP could have quickly obtained a suitable chair from any other source, and any such suggestion is belied by her own apparent inability to find any readier source of supply, although she had assumed the responsibility for procuring such a chair as early as May. She likewise presented no evidence that MCP could have quickly arranged for the construction of a special chair to meet her needs. In short, the record is devoid of any evidence that MCP could have reasonably accommodated Nathanson's needs between September 2 and September 5—or at any time prior to the date on which her special order from the chair company would have arrived.[4]

In my judgment, Nathanson failed to provide sufficient evidence that MCP acted unreasonably during any of the three periods leading up to her second voluntary withdrawal on September 5, 1986, and therefore the district court properly granted summary judgment in favor of MCP on Nathanson's Section 504 claim relating to her 1986 withdrawal.

### III.

I would affirm the judgment of the district court in all respects. MCP should not be compelled to bear the expense and risk of further litigation in this case.

---

[4]. Nathanson herself acknowledged in her complaint that there was nothing that MCP could have done at this point to accommodate her needs. Her complaint states (Amended Complaint, paragraph 26) (emphasis added):

By letter dated September 5, 1986, plaintiff advised MCP that she could not pursue her studies there because *it would not be possible to modify in a timely fashion the facilities necessary for her to attend classes.*