Memorandum of Decision
This is an action for termination of parental rights brought CT Page 9391 by the Commissioner of the Department of Families and Children ("DCF"). The respondents are the unmarried biological parents of Matthew S., born on April 11, 1996. Matthew was removed from his parents' care one month after his birth and was placed in his present foster home on May 14, 1996. The foster parents have provided complete care for Matthew and have embraced him as if he were a natural child of the family. The foster parents love the child and wish to adopt him if the parental rights are terminated. The child is reported to be friendly, engaging, active and "on-target in all areas of development." (Exhibit #1, p. 12).
I. Neglect Finding
On the same day that Matthew was placed in foster care, DCF filed a petition alleging that Matthew was a neglected child in that he had been denied proper care and attention and was being permitted to live under circumstances and associations injurious to his well being. The allegations specifically stated that the child's mother had a long history of mental illness, psychiatric hospitalization(s), drug use and domestic violence. On March 11, 1997, Matthew was committed to the care and custody of the Commissioner of the Department of Families and Children as a neglected child for the statutory period of one year. (Potter, J.)
II. Termination Petition Filed.
The commissioner filed this petition on August 14, 1998 alleging that the respondents are the parents of a child who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding and that they have failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parents could assume a responsible position in the life of the child. General Statutes (Rev. to 1997) § 17a-112 (c)(3)(B). The issue for adjudication before the court then is whether the respondents are better able to resume the responsibilities of parenting at the time of filing the termination petition than they had been at the time of the child's commitment on March 11, 1997. In re Michael M.,29 Conn. App. 112, 126, In re Hector L., 53 Conn. App. 359, 367 (1999). The court concludes that the respondents were not better able to parent this child on the date of the petition than they were at the time of commitment. CT Page 9392
III. Preliminary Findings
The court finds that there is no proceeding pending in any other court affecting the custody of the child. The court heard testimony over three days from DCF social workers, the child's foster mother, Richard Sadler the court-appointed, board certified psychiatrist, three relatives of the respondents, Jane O'Leary the director of the Thames River Program, the respondent mother's social worker, the paternal grandmother and the father of Matthew. The court received into evidence social studies, court approved expectations signed by the parents, arrest and conviction records, a list of services provided, psychiatric evaluations and various other documentary evidence, as of file appears.
The sociological history of the parents was presented in the form of testimony of the social workers, the psychiatrist, the social study and through the psychiatric reports (Exhibits 1, 6 and 7). This social history was largely unchallenged by the parents. The court makes the following findings by clear and convincing evidence.
IV. The father, Ronald S. Jr.
Ronald was born on November 1, 1974. He was twenty three years of age when Matthew was born. Ronald did not submit to the psychiatric evaluation and did not sign releases to enable DCF to obtain records from Seaview, a department of mental retardation residential program where he was residing until his present incarceration in the Connecticut Correctional colony. He was ably represented by counsel and was brought to court on each day of the trial of this case. He has never been married. He acknowledged his paternity only after a paternity test was performed and confirmed his paternity.
Ronald was convicted of Risk of Injury to a Child (§ 53-21) on Jan 22, 1997 and sentenced to six years in prison, the execution of which sentence was suspended. He was placed on probation for five years with certain conditions requiring his cooperation with an alternative incarceration program and with the department of mental retardation. While the social worker testified that Ronald had been arrested for sexual assault as a result of having sexual relations with a young women, aged fifteen, shortly after Matthew's birth, exhibit three clearly shows that he was charged CT Page 9393 with sexual assault in the second degree but that charge was nolled upon his plea of guilty to the risk of injury to a minor charge, General Statutes § 53-21.
In 1998, Ronald was arrested for harassment in the first degree (§ 53a-182b) and breach of peace (§ 53a-181). On March 10, 1999 he received a 3 year concurrent sentence for the harassment charge. The terms of Ronald's probation for the risk of injury charge required him to enter and complete a drug treatment program, to enter and complete sex offender treatment and therapy and to have no unsupervised contact with minors, nor to live in any home where minors were present. The court finds that these criminal events, harassment, breach of peace and the risk of injury to a minor charge are all forms of domestic violence.
While Ronald was on probation, the Department of Mental Retardation ("DMR") officials indicated that Ronald was not cooperating with DMR nor with the office of Adult Probation in that he was unwilling to get a job and he failed to attend his required sex offender therapy. (Exhibit # 10) On March 10, 1999, upon a finding of violation of probation, Ronald was sentenced to three years to serve in prison. He is presently incarcerated on a sentence to end on March 9, 2002, although he believes that he will possibly be eligible for release as early as January 22, 2000.
While he did not give the DCF social workers a thorough history, from his testimony, his competency evaluation by Dr. Sadler, and from his mothers guarded, cautious and very reluctant testimony, it is known that Ronald has limited intellectual ability. His mother has been named his conservator through probate proceedings. He was found by this court, after a competency evaluation performed by Dr. Richard Sadler, to be able to understand the nature of the proceedings and he was able to assist in his own defense of this case.
From age three to age thirteen Ronald was, according to his mother, on a medication known as Ritlin. He was always small for his age. His parents had a turbulent dysfunctional relationship ending in divorce. The parents still do not have a good relationship. At age thirteen Ronald could not be controlled within the public school system, ". . they weren't able to educate him" according to his mother. "I know for a fact he got thrown out of school in the 8th grade . . he started the 9th grade in Massachusetts . ." when he went to live with his father. CT Page 9394
The arrangement of living with his natural father did not last long. While Ronald was in Massachusetts he lived with his father until he was placed in a Massachusetts foster home[2]. When he found out that his mother had moved to Georgia to get away from her boyfriend, Ronald left Massachusetts and moved to Georgia to live with his mother.
Ronald was seventeen when he went to Georgia. He would not return to school and his mother believes that Ronald has no more than a ninth grade education. His mother stated that the only problems she had with him was that he would not attend school and that he would "get and quit, get and quit . ." jobs. But, she said, ". . we were able to survive."
Ronald's mother, who has now belatedly and timidly offered herself as a placement resource for the child, admits upon examination by the court, to her own emotionally troubled and psychiatrically involved recent history. She admits that she did not offer herself for the placement of the child in 1996 when the child was removed from the parents. Her move to Georgia and her subsequent return to Connecticut were the result of traumatic events in her life and difficulties in her personal relationship with her boyfriend. She did not share the specifics of her ten year relationship with her boyfriend except to say that she moved away from him and that on another occasion, because of his insecurity, she moved in with her son, Christina, the infant's mother, and the baby, shortly after the baby's birth in 1996. During that period of time she, Ronald's mother, was in a psychiatric unit of a local hospital and was attending out-patient treatment herself, ". . going every week to strengthen my own self." She said she wanted to take her own life and her boyfriend felt ". . if I lived with Ronald I would not take my own life."
During his testimony, Ronald now maintains that due to his new medication regime of Cogentin and Respiratol, he has changed his behavior, goes to church, alcoholics anonymous, narcotics anonymous, and he studies the bible. He further testified that in the few weeks following the birth of the child, Matthew, he fed the child changed the diapers and "snuggled him to sleep." He believes that his parental rights should not be terminated since he wants to be able to parent the child when he is released from prison at some indefinite time in the future. CT Page 9395
Ronald did not mention during his testimony, his anger, his substance abuse and his domestic violence directed at the child's mother, nor his sexually imposing himself upon the fifteen year old girl. On April 30, 1996, three weeks after the birth of the child, the mother, Christina reported to the emergency telephone service known as Careline, that the Ronald was intoxicated, she wanted him to leave, that he had been drinking, using marijuana, threatening her and that she was fearful for herself and the baby. She fled him and obtained a restraining order against him through the assistance of a women's center and the court. Ronald was offered substance abuse treatment at the Stonington Institute, an in-patient facility. He went to the intake and told the worker that the only reason he was there was because DCF required it. He did not enter the program. He did not cooperate with DCF with respect to offered services. He did not cooperated with the office of Adult Probation nor with the Department of Mental Retardation. Following an episode of domestic violence, Ronald left Christine together with his opportunity to parent the child. He did not make himself available for services necessary to enable him to be reunified with his child. In sum, absent the external pressures attendant with physical incarceration, Ronald did very little to help himself as a person and as a parent.
V. Ronald's Domestic Violence as a Placement Consideration
The issues of domestic violence are pernicious and widespread. They have been studied and discussed in both popular and professional literature. The Connecticut judiciary has received special training to deal with this issue.[3]
 The roots of domestic violence run deep in our society, and its causes are varied and complicated. Unfortunately, society has tolerated and, in some cases, even condoned such behavior for far too long.
 Domestic violence is, however, more than a social problem; it is, in fact, a deeply personal crime that traumatizes the victim and ruptures the stability of family life. It has been a factor contributing to the dramatic rise in substance abuse and to the pervasive incidence of violent crimes against all persons. Ellen A. Peters, Chief Justice[4]
This court has observed the deleterious effects of domestic violence or, perhaps more appropriately, the maltreatment of women and children upon hundreds of families. CT Page 9396
While some consider domestic violence to be only physical abuse such as slapping, hitting, shoving or assaulting a person, there are other forms of abuse that include psychological, sexual and financial abuse.[5] Forms of psychological domestic violence include components such as shouting, swearing, taunting, threatening, degrading, demeaning and stalking. Forms of sexual domestic violence include unwanted sexual touching, sexual harassment, rape and incest. Research indicates that the impact of the exposure to domestic violence upon preschool children includes nightmares, feelings of great insecurity, regressive behavior and fear of abandonment.[6] In the present case, Ronald has reportedly demonstrated forms of physical, psychological and sexual domestic violence. He is a risk to women and to children.
While the court is hopeful that Ronald's new found religious conversion and commitment to avoid drugs upon release will continue into the future and change his life for the better, the court is not optimistic that such will be the case. Outside of his incarceration, he was intellectually limited, educationally deficient, vocationally dysfunctional and unstable, substance impaired, domestically violent, resistant to treatment and a sexual predator of young women. The court has heard very little to inspire confidence that his present manifestations of civil redemption and good intentions have any long-term value whatsoever. The court observes that his declared conversion is a frequently mentioned phenomenon of incarcerated men, it is often externally motivated by the incarceration without meaningful internalization, and cannot be projected with any confidence to continue upon his release.
The court further finds with respect to the male biological parent, Ronald, that this child has been in foster care for more than three years. General Statutes (Rev. to 1997) § 17a-112
(c)(3)(B) requires the court to consider the age and needs of the child in determining the respondent's level of rehabilitation and whether it is foreseeable within a reasonable time. In re Luis210 Conn. 157, 167, In re Hector L. above at 367. The court concludes that when considering the age and needs of this child, Ronald is not in a position to assume a responsible in the life of the child within the foreseeable future.
V. The mother, Christine M.
CT Page 9397
Christine's father testified. He is, by his own testimony, a recovering drug addict and recovering alcoholic who was not available to emotionally or physically support Christina when she was a child. He "would go out on binges" and be completely dysfunctional. He was "not there a lot." He firmly believes that when the infant, Matthew, was born, Christina was not capable of parenting the child. He described Christina's life as "out of control."
At present he is proud of his own sobriety, he has remarried a women who is six years his senior, and while early in this case he was considered as a possible placement resource for the infant, he is quick to offer that while he likes his visitation as a grandparent, he and his present wife do not wish to care for and raise a young child.
Christina's mother was considered seriously as a guardian for the child. During the pendency of this case Christina was living with her nineteen year old unmarried sister, the sister's infant child and Jacquelynn D., her mother. This relationship of the two sisters and their mother was conflictual and disturbing to all. Ultimately, the maternal grandmother withdrew at her own request as a candidate for guardianship. Dr. Richard Sadler, the court appointed psychiatrist, in his second report of May 20, 1998, (Exhibit # 7), somewhat summarizes the situation as follows:
 The current relationship between Ms. D. (the mother) and Ms. M. (Christina, the daughter) appears to be essentially unchanged over the last number of years. Ms. D. is unable to confront her daughter's mental illness. Ms. M. is encouraged by her mother to continue her failures of responsibility and her lack of acknowledgment of her own mental illness. The relationship between the mother and daughter is a familiar and in many ways stable, but dysfunctional relationship. . . . However, emotionally, neither woman is able to directly address the other's distorted interactions and their emotional deficits. Both women use the other for their own purposes of deceit and dysfunctional emotional comfort while each is facilitating the other's emotional illness. Id. at p. 15.
In the 1998 interview, Christina's mother did produce for Dr. Sadler descriptions of Christina's continuing emotional disturbance, immaturity, lack of predictability, lack of consistency, her repeated failures to care for herself and CT Page 9398 pronounced difficulty was noted in Christina's ability to care for her son.
Christina was interviewed and evaluated by Dr. Sadler in November, 1996. She was twenty years old at the time. Dr. Sadler was impressed that Christina had "a good possibility that [she] may be able to develop the skills, attitudes and the support network that would allow her to fully adequately meet the needs for care, nurturance, guidance and support of her delightful infant." Approximately a year and a half later in May, 1998, after DCF had offered and provided numerous services, which will be later described, Christina had made some personal
rehabilitation, but no parental rehabilitation. (See In reChristina V., above, 38 Conn. App. 220.)
 Ms. M. shows, in this [1998] update of her previous psychiatric evaluation, no significant change in her psychiatric functioning over the past eighteen months. I found no change in her insight into her own psychiatric deficits. Ms. M. continues to be an intellectually mildly impaired, pleasantly related young mother of one child who is continuing to demonstrate poor impulse control, little to no insight into her own behavioral and psychiatric difficulties, and little sense of accepting responsibility for her child's welfare. Ms. M., when her trusting to the kindness of strangers and family fails, trusts to their naivete and to their ability to be manipulated by Ms. M.'s apparently earnest, but ultimately hollow, assertions of her efforts to change or of her sad experiences with unfortunate circumstances. While Ms. M. appears to have made some concrete and substantial gains in her personal functional abilities . . [she] has little to say that suggests increased parenting abilities or a better understanding of her own emotional difficulties and deficits." Id p. 7
The issues identified by Dr. Sadler relate to Christina's conduct not to any psychiatric impairment. Indeed, in his testimony he noted that he did not make a psychiatric diagnosis. Counsel for Christina, wishing to utilize the American's with Disabilities Act[7] as a shield against termination of parental rights, pointed to Christina's prior diagnosis and teenaged hospitalization for "bi-polar disorder." Counsel offered that he had with him "DSM-IV[8].", apparently to aid Dr. Sadler in a discussion of Ms. M.'s mental issues. CT Page 9399
Dr. Sadler described bi-polar disorder as a chemical imbalance that can lead to very dramatic psychiatric conditions, but that it is very treatable. He said it is one of those mood disorders that with appropriate medication allows one to live very normally, ". . to live as if they did not have the condition." Psychotherapy is only used to support the patient. Dr. Sadler indicated that bi-polar disorder does not respond well to support groups. The basis of treatment is medication management.
All Christina had to do to deal with this particular aspect of her multi-faceted problems was to regularly and consistently take her medication. She wouldn't. Neither Christina personally, nor her parents, support her use of prescriptive medication. Neither DCF social workers nor treatment providers were able to get Christina to consistently maintain her regime of medication. Dr. Sadler was asked by Christina's attorney what he would do to a patient who refused to take the medication, to which Dr. Sadler responded, "[A]rgue, cajole and, within ethics, I try to coerce, and then I get frustrated if a person refuses to take medication."
Dr. Sadler was asked about "borderline personality disorder," a diagnosis apparently made by earlier health-care providers and again by her therapist in 1998. Dr. Sadler indicated that the treatment for this personality disorder is more palliative; the medications do not bring about the completely restorative condition as with a mood disorder; they only stabilize the condition[9]. Christina does recognize that she has received this diagnosis and also that she is an alcoholic. She maintains that she has been in recovery from her alcohol and substance use for three years. It is reported in one social study that she is working at Foxwoods Resort Casino.
There was testimony offered from a community hospital therapist that Christina may now be regularly taking Debacote, a medication for depression. The therapist who has seen her seven times, says he is working with her on issues relating to getting on with her life without the child and on her future relationships. The therapist has never seen the child nor Christina with the child. According to the therapist, Christina is struggling with consistency.
VI. American's With Disability Claim[10]
CT Page 9400
Counsel for the respondent mother made reference on several occasions during the testimony to the American's with Disabilities Act. At no time did the respondent expressly state the nature of her disability or make a showing that she requested an accommodation to her disability. The respondent did not provide DCF a fair opportunity to provide any "necessary reasonable accommodation." See Nathanson v. Medical College,926 F.2d 1368, 1380 (1991).
The Americans with Disabilities Act of 1990 is the most significant labor and employment legislation of the decade. See generally, H. Perritt, Americans with Disabilities Act Handbook, 2nd Ed., John Wiley Sons, Inc. (1991). Title I of the Act,42 U.S.C. § 12111 through 1217, relate to the issues of equal opportunity for qualified individuals with disabilities to employment. These provisions do not directly apply to this case since the respondent does not appear to be claiming that she was denied an employment opportunity at DCF by virtue of a disability.
If any section does apply to this case it would likely be under Title II which relates to State and local governmental obligations. An understanding of certain terms used throughout the Act is necessary to determine to whom the Act applies and how it applies.
Definition — 42 U.S.C. § 12131(1), defines "Public Entities" to include ". . any department, agency, special purpose district or other instrumentality of a State . . ." The State of Connecticut, department of children and families qualifies under the definition as a public entity.
At the beginning of the Americans with Disabilities Act, immediately following the "Congressional findings and purposes" the Act § 12102(2) defines "disability."
The term "disability" means, with respect to an individual —
 (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
(B) a record of such impairment; or
 (C) being regarded as having such an impairment. CT Page 9401
The term "major life activities" as used in the Act includes such activities as "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning. and working." 29 C.F.R. § 1630.2(I).
Section 12131(2) defines "Qualified individual with a disability":
 The term "qualified person with a disability" means an individual with a disability who, with or without reasonable modifications to rules, policies or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.
Another term of art under the Act is contained in § 12132 "Discrimination."
 Subject to the provisions of this title, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subject to discrimination by any such entity.
Accordingly, the Americans with Disabilities Act gives "qualified individuals with a disability" the following rights under Title II:
"1. Not to be excluded from participation in the services, programs, or activities of a public entity because of the disability.
2. Not to be denied the benefits of services, programs, or activities of a public entity because of the disability.
3. Not to be subjected to discrimination by a public entity because of the disability."[11]
With these definitions in mind it becomes possible to analyze the respondent's references to the Act. First, the respondent's claim that she is self-reliant, competent, working and capable to CT Page 9402 care for the child is inconsistent with a claim under the American's with Disabilities Act.
To be covered by the act the respondent must make a threshold showing that she suffered substantial limitation of a major life activity in order to establish a disability within the meaning of the act. Depression is a mental impairment that does not, by itself, constitute a disability under the ADA. Pritchard v.Southern Co. Servs. 92 F.3d 1130, reh. den. 102 F.3d 1118 (1996). Similarly, in Palmer v. Circuit Court Clerk of Cook Co.,905 F. Sup. 499 (1995), the plaintiff was not disabled within the meaning of the ADA where she produced no evidence that her depression and paranoia substantially limited any major life activity to the extent she was unable to perform her job. InHatfield v. Quantum Chemical Corp. 920 F. Sup. 108 (1996) the plaintiff suffered from mental problems which were diagnosed as severe major depression, post traumatic stress disorder and borderline personality disorder. The court found that he was not disabled within the meaning of the ADA where he offered no evidence that his mental impairment substantially limited him in his ability to care for himself and no evidence that his condition prevented him from performing a broad range of jobs.
Even assuming that Christina could and did prove 1) she had a disability, and that 2) she was substantially limited in her ability to live and work, her claim would still fail since she failed to show that she was excluded from participation or denied the benefits of the services, programs or activities of DCF. Neither did the respondent" identify the additional types of services the department could have provided [her] or how such services could have been offered . . ." In re Hector L., above at 371-372.
The array of services offered to Ms. M., prior to the removal of the child and then subsequent to the removal of the child, was extremely impressive. In the home in April of 1996, immediately after Christina returned to her home from the hospital with the infant, DCF orchestrated daily in-home nursing services, social worker case management services, bi-weekly pediatric services and bi-weekly psychiatric nursing services. Through the efforts of the Reliance House, the case worker for Ms. M. physically transported her and coerced her and the child to attend pediatric visits, sometimes against Christina's declared wishes. DCF made referrals to other support network services for women in abusive relationships and for individual counseling. CT Page 9403
Subsequent to the removal of the child, DCF continued to provide and refer her to appropriate services with the ultimate goal of reunification with the child. One such service provider which particularly addressed her psychiatric disabilities was the Community Mental Health Services of Southeastern Connecticut ("CMHSSC"). Blandina Ponte, a DCF social worker testified that she stayed in close contact with all service providers to share information on Christina's problems and progress in treatment. She further testified that it was the policy of DCF to offer an abundance of services to clients with mental conditions. One of Christina's counselor's at CMHSSC reported that Christina ". . was in a manic state, was sabotaging reunification efforts with maternal grandmother, and at risk of abusing substances." Christina, against the advise of her therapist and her DCF social worker, terminated her services at CMHSSC after seeing the staff psychiatrist who had prescribed psychoactive medication for her. Exhibit #1, p. 6-7.
One further provision of the Act has application to this case. 42 U.S.C. § 12201 "Construction" part (d) "Accommodations and Services" provides:
 Nothing in this Act shall be construed to require an individual with a disability to accept an accommodation aid, service, opportunity or benefit which such individual chooses not to accept.
The testimony in this case supports a finding by the court that the respondent was offered services which she elected not to accept, and instead sought other services on her own. She had the right to seek other services but cannot fault DCF for then failing to continue to provide the same or similar services.
In summary, the respondent has failed to prove that she has a qualifying disability under the ADA and, even if she did, she has failed to identify a service or benefit from which she was excluded, denied or discriminated. Additionally, as previously mentioned, she refused to accept services that were provided. Accordingly, the court finds no violation of the Americans with Disabilities Act.
VII. Adjudication
The court places great weight upon the opinion of Dr. Sadler. CT Page 9404 His opinion, which has changed over time, is that as of the present time, Christina does not have a parent-child relationship with Matthew, that she does not demonstrate increased insight or increased parental abilities over the past eighteen months and that ". . it is exceedingly unlikely that [she] will be able to develop the skills and abilities, emotional stability and interpersonal steadinesss required in order for her to be able to provide minimally adequate parenting for her son, Matthew."
Her mother, from whom Christina has recently separated, does not believe that Christina can parent this child and can barely care for herself. The Department of Children and Families has made an assessment over two years prior to bringing this action, that Christina has not demonstrated progress in her ability to care for the child. Over the course of the past three years, both parents have, from time to time, indicated that they wished to consent to terminate their parental rights.
While Practice Book § 33-7 provides the respondents with the right to produce witnesses on behalf of any dispositional plan, neither parent offered to the court a plan of care for the child or a timetable to implement such a plan in the foreseeable future.
Upon a careful consideration of all the documentary evidence and the testimony presented the court makes the following finding by clear and convincing evidence: that Christine M. and Ronald S. are the parents of a child, Matthew S. who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding on March 11, 1997, and that they have failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parents could assume a responsible position in the life of the child. General Statutes § 17a-112
(c)(3)(B). The court finds that this ground has existed for more than one year.
VIII. Mandatory Findings
Having determined that statutory grounds exist to terminate the rights of the parents, the court must consider whether it is in the child's best interest to enter an order of termination based upon facts existing as of the date of trial. In Re: RomanceM., 229 Conn. 345, 356-57 (1994). The court is further mandated to consider and make written findings regarding the seven CT Page 9405 findings set forth in General Statutes (Rev. to 1997) § 17a-112
(e), now § 17a-112(d).
1) The timeliness, nature and extend of services offered. The court finds that parental, psychological and psychiatric services were offered, visitation was offered and foster care was provided by DCF. Services were commenced for this family prior to the birth of the child. In home services were provided in the hope of maintaining the child in the home. When this proved unworkable, service were offered to both parents including the following mental health and substance abuse services to the father. Since the Office of Adult Probation and the Department of Mental Retardation had services offered and ordered, it was not necessary for DCF to duplicate those services.
Mother was offered services at Reliance House, Madonna Place, the Women's Center, Smith Bent Visitation services, Thames River Family Program, Katie Blair House, Community Mental Health Services, Catholic Charities counseling and parenting education. (See also general discussion of services pp. 13-14)
2) Whether DCF has made reasonable efforts to reunite the family pursuant to the Adoption Assistance and Child Welfare Act of 1980. (See services mentioned above.) The parents had more than enough time to demonstrate their desire and concern for reunification and to achieve rehabilitation. The mother of the child was offered services, therapy and medication that she did not always choose to accept or consistently observe. It is not clear that even to this day she recognizes her need for therapy and how her psychiatric conditions impact on her behavior.
3) The terms of applicable orders entered into and agreed to by any individual or agency and the extent of fulfillment of those obligations, etc. The court finds that the mother did not fulfill or comply with the expectations and service agreements, described more fully in the social study. She appeared more interested in pursuing her dysfunctional relationship with Ronald than resolving her multitude of personal troubles. Ronald was only tepid in his enthusiasm to comply with court ordered expectations and ultimately, profoundly violated the expectations ("abide by the conditions of probation") by his felonious conduct and subsequent probation violation which resulted in his incarceration.
4) The feelings and emotional ties of the child with respect CT Page 9406 to the parents and foster parents, etc. The court finds that the child is bonded to his present foster family, considers himself a part of the family and that no presently existing emotional bonds will be broken by termination of the parent's rights.
5) As to the age of the child. The child is three years and three months of age.
6) The efforts the parents have made to adjust their circumstances or conditions. The court finds that the mother has been unsuccessful in making any meaningful attempt to adjust her circumstances, conduct or condition to rehabilitate herself as a parent. She has made progress in her personal rehabilitation. Inre Christina V. 38 Conn. App. 214 (1995).
7) The court finds that there has been nothing to prevent the parents from maintaining a meaningful relationship with the child. There was no unreasonable conduct by DCF noted. The father has by his criminal conduct and refusal to participate in sexual offender therapy effectively prevented himself from maintaining a relationship with the child. The mother has missed appointments and failed to organize and manage her affairs to increase her time with her child through the years. This failure to aggressively attend to the work of reunification belies her claims of parental rehabilitation.
 DISPOSITION
Based upon the foregoing findings, the court determines that it is in Matthew's best interest for a termination of parental rights to enter with respect to the mother Christine M. and the male biological parent Ronald S. and accordingly a termination of their parental rights is ordered. It is further ordered that the Commissioner of DCF is appointed statutory parent for this child for the purpose of securing a permanent adoptive family. If the foster parents are willing to adopt, as is their declared position, it is the court's direction that they receive first consideration. The commissioner shall file with this court no later than 90 days following the date of judgment a written report of efforts to effect such permanent placement and file further reports as are required by state and federal law.
Judgment shall enter accordingly,
Francis J. Foley, Presiding Judge CT Page 9407 Child Protection Session
[2] The social study, Exhibit 1, reports that Ronald lived in 21 different foster homes while living in the state of Massachusetts. This was disputed by the respondent.
[3] See "Domestic Violence Benchguide" Office of the Chief Court Administrator, Connecticut Center for Judicial Education, 1991
[4] Id. Forward by the Chief Justice
[5] Id.
[6] "Custody disputes involving domestic violence: Makingchildren's needs a priority" Doyne et als, Juv. Family Court J.,1, 4. Spring 1999
[7] The Americans with Disabilities Act, 42 United States Code § 12101 et seq.
[8] DSM-IV is a trademark acronym for the Diagnostic andStatistical Manual of Mental Disorders, Fourth Edition, American Psychiatric Association, Washington, DC, 1994
[9] DSM-IV defines a personality disorder as an enduring pattern of inner experience and behavior that deviates markedly from the expectations of the individual's culture, is pervasive and inflexible, has an onset in adolescence or early adulthood, is stable over time, and leads to distress or impairment. A borderline personality disorder is a pattern of instability in interpersonal relationships, self-image, and affects, and marked impulsivity. p. 629.
[10] Occasionally referred to as "ADA" or "the Act."
[11] Perritt, above at 164.