Sparkes v. Norwich University, No. 484-9-01 Wncv  (Katz, J., June 7, 2005)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

STATE OF VERMONT                                SUPERIOR COURT

Washington County, ss.:                      Docket No. 484-9-01 Wncv


SPARKES

v.

NORWICH UNIVERSITY


FINDINGS OF FACT,
CONCLUSIONS OF LAW,
AND NOTICE OF DECISION


On the basis of the evidence presented at trial, the following decision is announced.

FINDINGS OF FACT

1.  Plaintiff Jeffrey Sparkes is an Ontario resident who applied and was admitted as a student to Norwich University.  Cynthia and Roland Sparkes are his parents, who paid approximately $30,000 to Norwich in tuition and fees.  Norwich is an institution which receives federal funding.

2. Jeff Sparkes attended Norwich, as an undergraduate, for four academic years, the last semester having been spent at Buckinghamshire College, England as part of a Norwich-sponsored study-abroad program. He was an accounting major.  Through the four years, Jeff's performance at Norwich was mediocre, at best.  His grades slipped down into the Ds and Cs, and some courses were failed.  At one point, he was suspended from participation in rugby.  As a very general matter, he did better in the area of accounting and business than in English.

3.  As an accounting major, he had certain requirements for graduation.  Two final required accounting courses turned out not to be available at Buckinghamshire, so Jeff found himself at the end of four years not having completed the requirements for graduation.  To resolve that problem, his mother, Cynthia, contacted Professor Murtaugh, Jeff's adviser. Although Murtaugh returned her call in June, he did not respond to letters she mailed to him regarding finding the two required courses.  It is not at all clear why he failed to respond, although the circumstances suggest it may have been because the letters were sent during the summer recess while Murtaugh may have been off campus.

4.  Jeff did, however, learn that the courses (Cost Accounting and

Auditing) were available from Nipissing University, an Ontario institution. Norwich indicated it would accept credits from Nipissing for the stated courses. Jeff attended Nipissing, but failed the first semester, dropped out, and still did not have the courses required for the Norwich degree.

5. It was planned by the family that Jeff would return to Norwich for the Fall 2000 semester to complete the remaining requirements. That would

have been the start of the sixth academic year since matriculating at Norwich. In August, however, after the unsuccessful stint at Nipissing, Jeff broke down and made clear to his parents that he would not return to Norwich–"I can't go any more." The words "broke down" are Plaintiffs', but we have little doubt that it was an emotional moment. Jeff was clearly distraught at the prospect of returning to Norwich, where he still feels that his reading problems made him appear inept in classroom situations.

6. Being disappointed by this turn of events and the failure to complete college degree requirements, the Sparkes family began to ask why. This led to an evaluation of Jeff, which revealed that he is seriously dyslexic. A report was completed by August 22, 2000. Its conclusions include the following:

> The prognosis for successful intervention to assist people with dyslexia varies according to the nature of the dyslexia and its severity. In general, more severe and complex forms of dyslexia will require longer intervention programs. Intervention programs for adults also require a longer period of therapy. Although intervention programs will offer assistance to overcome the handicapping consequences of the disability, dyslexia cannot be cured. Individuals with dyslexia will have a lifelong difficulty with language-based tasks. Because of the severity of Jeffrey's dyslexia, an exemption for second language requirement is recommended.

4

7.  Such a conclusion is quite consistent with Jeff's long-term failure to perform well in school, particularly in English, reading, and related subjects.  Indeed, that poor performance stretches back to his first grade performance, which had led the first grade teacher to recommend against promotion to second grade.  That recommendation was overruled by Jeff's parents.  At approximately six years of age, the parents had Jeff seen by a psychologist for evaluation.  It is not clear what follow-up ever was done regarding that person's recommendations.  Not only were grades consistently poor in these subjects, but his standard test scores in them were poor, and consistently below his performance and mathematics scores on such tests.  This disparity extended to the American College Testing (ACT) scores, which were sent to Norwich as part of its admissions process, albeit after the positive admissions decision already had been reached and communicated to Jeff.  Along with all his fellow 1995 freshmen, Jeff was administered a Nelson-Denny standardized test, or at least part of it, but his comprehension score on that test, by itself, did not "red flag" a learning disability.  Again, however, it was below the math score on that same test.

8.  Mrs. Sparkes sent the Canadian dyslexia evaluation to Norwich, where it was routed to Ms. Gills, the head of Norwich's Learning Center.  She reviewed the evaluation and communicated to the Sparkes that it was insufficient because it lacked a proper diagnosis.  In particular, she noted that there was a request to drop a required French course, but that such was not supported by a clear and specific diagnosis directed to any impediment that would be imposed by studying French.  The Sparkes had further

5

evaluation done in Ontario and sent to Ms. Gills a second evaluation report. This evaluation recommended that Jeff be exempted from taking French and that he be given extra time to complete written reports, spell-checking programs, mentors to aid with such items as spell-checking, and "templates" for written reports.

9.  There is no evidence supporting a finding, and we are not persuaded, that Jeff Sparkes would have returned to Norwich in 2001, for what would have been his sixth year of college, no matter what accommodations might have been made.

10.  There is also no evidence supporting a finding that Jeff needed accommodation to complete the final two Accounting courses at Norwich. The credible evidence suggests that he did quite well in Accounting, ranking, for example, maybe in the top third of Professor Rotondi's classes. Although Jeff did very poorly at the accounting courses at Nipissing, after leaving Norwich, it is clear that his psychological state by that time had become very negative. This seems beyond doubt, given his graphic testimony. He was, by then, consumed with anger and frustration.

11.  Norwich has a Learning Support Center to assist students with learning difficulties. Jeff knew of this center and knew it was located in the Library. He nevertheless long delayed going to the center, saying he could not find it in the Library. He never asked anyone in that structure "where's the Learning Center?" When he finally did find and enter the Center, while matriculated, he was met by a receptionist or secretary. He asked that

person to see someone for assistance in learning. She responded that before seeing anyone he would have to fill out the prescribed form. She gave him a copy. Jeff placed the copy with his things, brought it back to his room, and either lost or forgot it. From his point of view, it was just one more printed page, a printed form, relatively indistinguishable from all others. He never filled out the form, never spoke with anyone at the Learning Center, and continued at Norwich.

12. We are not persuaded that providing Jeff the kinds of support suggested in the August 2000 dyslexia evaluation would have made a difference. He did and apparently continues to suffer from a difficult disability. In the years since leaving Norwich, roughly ages 25-30, a time in which Jeff has clearly been a mature adult, he has not overcome the difficulties. If his family did not provide the support indicated necessary back in the first grade; if Jeff never followed through with Norwich's Learning Center, as by even mailing the demanded form to his mother to fill out; if Jeff has found spell-checkers more confusing than helpful, as he has made clear; what is the court's basis now for making the factual inference that he would then have used all the aids recommended, if supplied? It is tragic that a talented person such as Jeff saw his problem ignored for as long as it was, starting in the first grade. But it is speculative to think that the 25 year old Jeff of 2000, having the angry attitude toward returning to the classroom that he so obviously did, simply would have swallowed that attitude and accepted the accommodations had they been supplied by Norwich, and then finished the two or three remaining courses necessary for a degree.

7

13.  Even today, given the perspective and maturity of five additional years, Jeff firmly rejects the kinds of assistance recommended in that Canadian Dyslexia report.  He does not want spell-checkers.  He was never asked about "templates" or thesauruses.  But given his antipathy to the world of words, in which he becomes afraid and confused in a library, report templates seem an unpropitious and unpersuasive aid.  Instead, Sparkes testified he wants "correspondence courses" to be offered him by Norwich, for the two accounting courses.  He wants the degree to be awarded.  The fact that Norwich does not offer those courses in such a form seems irrelevant to him.  We will not engage in the speculation necessary to make the finding that correspondence courses, now or five years ago, would permit plaintiff to successfully complete the two remaining accounting courses.  At Norwich, with accounting courses, he had generally done well in the traditional class context.  The real reason correspondence courses are now on the horizon is that Sparkes refuses to return to campus.  Hence their desirability would seem to flow more from the flexibility to remain off campus, rather than the need for accommodation.

14.  Jeff now operates a small business with a partner.  They have two pizza shops, at locations somewhat distant from each other.  The shops have had some difficulties unrelated to this litigation of Jeff's dyslexia, but are continuing after two years.  They employ more than fifteen workers, in addition to delivery drivers.  They are not yet producing much income for Jeff, but their continued operation after more than two years demonstrates

that he has business ability. Because of the dyslexia, however, he never takes down telephone orders and all books are kept by his mother.

15. Jeff admitted on the stand that he is ill-suited to become an accountant. He cannot deal with all the figures, looking for the mistakes of others. Indeed, the books for his own small business, kept by his mother, must be reproduced in large type on colored paper for him to be able to read it. He did express an interest in becoming a "CMA," a Canadian term apparently designating one with some level of accounting background, but who is pursuing a management, rather than auditing, career path. There was no evidence regarding requirements for a CMA designation, whether Jeff would have the ability to meet those requirements, whether with some reasonable accommodations or otherwise, or what CMAs make in the Toronto area. No finding of likelihood of success as a CMA is supported by the evidence.

## CONCLUSIONS OF LAW

16. Generally, the purpose of the Rehabilitation Act of 1973 is to prohibit discrimination on the basis of disability in programs conducted by Federal agencies, in programs receiving Federal financial assistance, in Federal employment, and in the employment practices of Federal contractors. 29 U.S.C. § 794.

17. Section 504 of the Act, at issue here, states that no "qualified individual with a disability in the United States . . . shall . . . be excluded

9

from . . ., be denied the benefits of . . ., or be subjected to discrimination under" any program or activity that receives Federal financial assistance, as Norwich University does.  29 U.S.C. § 794(a).  To establish a claim for a violation of Section 504, a plaintiff must prove that he is disabled under the Act, is otherwise qualified for the program from which he was excluded, and was discriminated against on the basis of that disability.  "Otherwise qualified" connotes the ability to meet program requirements with reasonable accommodations for the disability.  Kaltenberger v. Ohio College of Podiatric Medicine, 162 F.3d 432, 435 (6th Cir. 1998).

18.  Notice of the disability, though moot in the many cases where the disability is obvious, is integral to such a claim.  In cases of less than obvious disabilities, such as here, a post-secondary academic institution without reasonable notice cannot be said to have failed to reasonably accommodate it.

> In the section 504 milieu, an academic institution can be expected to respond only to what it knows (or is chargeable with knowing).  This means, as the Third Circuit has recently observed, that for a . . . school "to be liable under the Rehabilitation Act, [it] must know or be reasonably expected to know of [a student's] handicap."  Nathanson v. Medical College of Pa., 926 F.2d 1368, 1381 (3d Cir. 1991).  A relevant aspect of this inquiry is whether the student ever put the . . . school on notice of his handicap by making "a sufficiently direct and specific request for special accommodations."  Id. at 1386.  Thus, we must view the reasonableness of [the school's] accommodations against the backdrop of what [the school] knew about [the student's] needs *while he was enrolled there*.

10

Wynne v. Tufts Univ. Sch. of Medicine, 976 F.2d 791, 795 (1st Cir. 1992) (emphasis added). Norwich never had actual notice of Jeff's disability at any time during which he was enrolled there. The evaluation that first formally revealed the dyslexia diagnosis was conducted after Jeff's efforts at Nipissing, when he had ceased taking classes at Norwich.

19. Plaintiffs argue instead that the various symptoms that Jeff suffered, and their academic effects, were sufficient alone to charge Norwich with notice of the disability. However, those facts suggest only consistently poor performance in English and reading-related courses, the problem Jeff had endured his entire academic career, and not more. Though Jeff at one point approached Norwich's Learning Center for help, he did not follow through by filling out the required form, or by requesting help in filling out the form. Even if he had, merely filling out a form would not have been sufficient to obligate Norwich to provide accommodations. Norwich "was not obligated to provide accommodation until plaintiff had provided a proper diagnosis . . . and requested specific accommodation." Kaltenberger, 162 F.3d at 437 (telling "an academic counselor at the College that she thought she might have [a disability] simply did not impose an obligation to offer accommodations"). That simply did not occur in this case. We are not at all persuaded that some hostile environment at Norwich burdened Jeff with insurmountable obstacles to making known his disability. Plaintiffs have produced no cases – and we have found none – suggesting that circumstances such as those present in this case could be sufficient to trigger a postsecondary academic institution's obligation to

11

accommodate a disability. A post-secondary academic institution is not a guarantor of its students' academic success, and the discovery of all impediments to it, including undiagnosed learning disabilities of which it reasonably is unaware. In effect, plaintiffs seek to impose on Norwich a burden or duty greater than mere accommodation--they would hold it liable for failing to recognize and diagnose. We are aware of no law imposing such a duty.

20. We thus conclude that Plaintiffs have no basis for any damages arising out of Jeff's time at Norwich.

21. Nevertheless, with the disability finally documented after the end of Jeff's academic career, Plaintiffs request that Norwich be required to accommodate it by allowing Jeff to complete the final credits necessary for graduation by waiving certain language requirements, and by allowing him to take the remaining accounting classes by correspondence. Ignoring that Jeff seeks this relief at a time when, so far as the court can tell, he no longer is enrolled at Norwich University, still we find such relief unfounded. First, Jeff does not need accommodations to complete accounting courses successfully. Second, Norwich does not offer the classes Jeff seeks by correspondence, and we are not persuaded that it would be reasonable to provide them specially to him in that way. Third, even if Jeff's disability did affect his ability to complete these classes, no evidence suggests that the correspondence nature of the request addresses the effects of the disability. It would seem to exacerbate them by placing heavy emphasis on the skills that are so problematic: reading, computer usage, etc. Correspondence

12

courses would not accommodate the disability; they merely would allow him to take the classes while not in residence, something not obviously related to Jeff's disability. Given his strongly voiced antipathy to computer screen and difficulty with reading, correspondence courses seem an ill-suited attempt to accommodate--to master material in the remaining accounting courses. Plaintiffs concede that Norwich eventually offered "accommodations regarding time allowances, report templates, spell checkers, mentors, and foreign language substitution," but that he dismissed them as untimely and unhelpful. Plaintiffs' Supplemental Memorandum of Law 7 (filed May 25, 2005). Plaintiffs had the burden of making sufficiently specific requests for accommodations. In these circumstances, Norwich cannot be held accountable for the timing of efforts to accommodate. Moreover, the rejected accommodations are the ones recommended to the school with the diagnosis supplied by Jeff's family. There is no basis for any relief he now seeks.

22. Plaintiffs' breach of contract claim is so vague that the court considers it waived. Plaintiffs allege without specification that Norwich made "oral and written representations," in the student handbook or elsewhere, to the effect that Jeff "would not fall through the cracks." Plaintiffs' Trial Memorandum 14 (filed May 3, 2005). As the court understands it, they claim Norwich breached this promise by allowing Jeff to fall through the cracks. This is really just a general objection to their view of the quality of Jeff's educational experience at Norwich. "Contract claims that in fact attack the general quality of educational experiences

13

provided to students have generally been rejected." <u>Cencor, Inc. v. Tolman</u>, 868 P.2d 396, 399 (Colo. 1994).

## NOTICE OF DECISION

For the foregoing reasons, Defendant Norwich University is entitled to judgment on the Sparkes' claims. Counsel for Defendant to submit a proposed form of judgment.

Dated at Montpelier, Vermont, _____, 20__.

_____
Judge

14